JONES MIN. CO. v. CARDIFF MIN. & MILL. CO. et al.

No. 2401. Decided April 28, 1920. Rehearing denied July 15, 1920.
(191 Pac. 426.)

1. CORPORATIONS—"DIRECTORS" ARE MANAGING AGENTS AND MAY BE CHARGED AS TRUSTEES WITH CORPORATE MONEY OR FUNDS. Directors are not trustees in the true sense of the term, but are the managing agents of the corporation, and as such sustain a fiduciary relation both to it and to the stockholders collectively, and if they wrongfully deal with or appropriate money or funds of the corporation they may be charged as trustees with respect to such property the same as any other agent or person who sustains a fiduciary relation to his principal.

2. LIMITATION OF ACTIONS—CAUSE OF ACTION FOR CORPORATE DI-
RECTORS' FRAUDULENT ACT ARISES ON DISCOVERY OF FRAUD. Cor-
poration's action to have defendants declared trustees for the
benefit of the corporation as to mining claim on ground that
relocation was pursuant to collusive agreement between director
of the corporation and relocators was barred by limitations
under Comp. Laws 1917, section 6468, subd. 4, three years from
the discovery of the directors' violation of the fiduciary relation-
ship, the fiduciary relationship of the director to the corpora-
tion arising out of a constructive or implied trust and not an
expressed trust.[1]

3. EQUITY—LACHES BASED UPON PRINCIPLES OF EQUITY. The doc-
trine of laches is not based upon time alone, but rests on the
maxims and principles of equity.

4. CORPORATIONS—CONTINUE TO EXIST THOUGH WITHOUT OFFICERS
OR DOING BUSINESS. That a corporation was without directors
and officers and had entirely ceased to do business did not de-
prive it from being a corporation and continuing to exist as
such.

5. CORPORATIONS—THAT CORPORATION WAS WITHOUT OFFICERS NO
DEFENSE OF LIMITATIONS AND LACHES. In an action by a corpo-
ration defended on the ground of laches and limitations, it was
no answer to such defense that the corporation was without
officers and directors and had ceased to do business during the
interval between the time of the fraud complained of and the
commencement of the action, since the stockholders could have
at any time elected the necessary officers to bring the action
or could have brought action in their own name.

6. EVIDENCE—COURT WILL TAKE JUDICIAL NOTICE OF CORPORATION
LAWS. The court will take judicial notice that two persons were
not the sole incorporators of the corporation and owned all the
stock thereof, since such a corporation and ownership would
have been in violation of the statute.

7. MINES AND MINERALS—ACTION AS TO MINING CLAIM BASED ON
COLLUSIVE AGREEMENT WITH CORPORATE DIRECTOR HELD BARRED BY
LACHES. Corporation's action to declare a trust based on the
relocation of mining claim on which plaintiff corporation had
made original location, pursuant to collusive agreement between
defendants and director of plaintiff corporation, brought fifteen
years after the fraud complained of, was barred by laches;

---

[1] *Gibson* v. *Jenson*, 48 Utah, 248, 158 Pac. 426; *Salt Lake City* v.
*Investment Co.*, 43 Utah, 181, 134 Pac. 603.

the corporation and stockholders being charged with notice of the relocation.

8. EVIDENCE—JUDICIAL NOTICE TAKEN OF MODE OF OBTAINING TITLE TO MINING CLAIM. Court will take judicial notice how and under what law the title to lode mining claims may be obtained from the government of the United States.

9. CORPORATIONS—LIMITATION OF ACTIONS—ALLEGATION OF LOSS OF BOOKS DOES NOT OVERCOME DEFENSE OF LACHES AND LIMITATIONS. Allegation that books of corporation were lost during interval between fraud committed by director and the commencement of action based thereon is not sufficient to overcome defense of laches and limitations in absence of allegation that diligent effort had been made to find books.

10. EVIDENCE—COURT WILL TAKE JUDICIAL NOTICE AS TO LAND LAWS. Court will take judicial notice of the law that lands in the United States bearing metalliferous ores can be acquired only by means of development, and that improvements must be made annually either on the particular claim or on some contiguous claim, and that, if not made on the claim, notice must be posted thereon as to place where work is being done or improvements being made.

11. CORPORATIONS—DIRECTORS HELD TO HIGH DEGREE OF FIDELITY. Directors are held to a very high degree of integrity and fidelity in the discharge of their duties.

12. EQUITY—WILL NOT PERMIT WRONGDOER TO PROFIT. Equity will not permit a wrongdoer to profit by his wrong.

13. EQUITY—WILL NOT ENCOURAGE STALE CLAIMS. Equity should always insist upon reasonable diligence, and not encourage stale claims, and thus open the doors of courts to those who have slept upon their rights.

GIDEON and WEBER, JJ., dissenting.

Appeal from District Court, Third District, Salt Lake County; *Wm. H. Bramel,* Judge.

Action by the Jones Mining Company against the Cardiff Mining & Milling Company and others. Judgment of dismissal, and plaintiff appeals.

AFFIRMED.

*James Pardee* and *A. B. Sawyer, Jr.*, both of Salt Lake City, for appellant.

*Wm. M. McCrea*, of Salt Lake City, for respondents.

FRICK, J.

This action was instituted for the purpose of having the defendants declared trustees and as holding in trust for the use and benefit of the plaintiff a certain mining claim hereinafter referred to. The complaint is very long, and the statements therein are somewhat loose and inartificial, with many repetitions and some conclusions. The material and controlling facts alleged are as follows:

It is alleged that the Jones Mining Company of Utah, hereinafter called plaintiff, is a mining corporation, and that the defendant Cardiff Mining & Milling Company, hereinafter designated company, is a corporation; that in the year 1902 plaintiff was the owner, subject to the paramount title of the United States, and in possession of what is known as the Wrexim mining claim in Salt Lake county, Utah; that the notice of location of said mining claim was duly recorded in Salt Lake county in 1891; that the assessment or representation work upon said claim was performed up to and including the year 1901, and that the same was not open for relocation until after the 1st day of January, 1902; that in September, 1902, one Thomas B. Jones, now deceased, and the defendant Reamer, were the only directors of the plaintiff. (It is, however, stated in plaintiff's brief that "at the time of the commitment of the fraud [1902] Jones was a director and the only director of the company," the plaintiff.) Then it is alleged that the number of directors provided for by the articles of incorporation of plaintiff was five; that all the other acting directors (except Jones) had died prior to 1902 and no successors had been elected; that in the fall of

1902 Jones, Price, and Reamer entered into a conspiracy to defraud the plaintiff of its interest in said claim by relocating the same; that said claim was accordingly relocated in September, 1902, in the name of said Reamer as the "Mountain Chief"; that the location notice was duly recorded in Salt Lake county; that said Reamer, as a part of said conspiracy, "in about a year's time was to convey it to Jones," but that said Reamer at no time conveyed the same to said Jones; that said Reamer thereafter conveyed a one-half interest in said mining claim to his codefendant Price, and thereafter "said Price and Reamer were holding the legal title to said property as trustees in trust for the benefit and use of the Jones Mining Company of Utah," the plaintiff herein; that on December 6, 1906, said Price and Reamer "conveyed to the defendant Cardiff Mining & Milling Company the entire interest in said Mountain Chief mining claim, and said company received it and based its organization with other claims on said Mountain Chief mining claim, and the defendant Cardiff Mining Company now holds the legal title thereto"; that said company purchased with full knowledge of plaintiff's interest in said mining claim and that it is not an innocent purchaser; that said Price and Reamer promoted and organized the company and became stockholders and officers therein, said Reamer owning 186,000 shares and said Price 250,000 shares of the capital stock; that in the month of March, 1905, said Jones died; that said Reamer was a son-in-law of said Jones and acted as the executor of the last will and testament of said decedent, but made no mention in the inventory or in the final decree of distribution of said estate that it had any interest in or held any stock in the plaintiff; that Reamer's wife was an heir of said decedent and a beneficiary under his will, but none of the other heirs or beneficiaries under said will knew of the decedent's interest in said mining claim, and they did not know until about the month of July, 1917, that they, as heirs of said decedent, owned any stock in plaintiff; that plaintiff never knew that any development work had been done on said claim, and that no work was ever done

upon the surface or any ore taken from the surface thereof; that up to the time said Jones died no stockholders' meeting was ever called or held, and that no stockholders' meeting was called or held until in the month of July, 1917, at which time the stockholders of the plaintiff elected a new board of directors, and that at that time the plaintiff, for the first time, became aware of the fraud and misconduct of the defendants; that the books of the plaintiff were lost in or about the year 1901 and were not found until the year 1917; that one Thomas Miller was the first president of plaintiff, and at the time of his death, in September, 1901, owned a majority of the stock of plaintiff; that his heirs lived in New York City and did not know, nor did the plaintiff know, that they, as heirs of said Miller, owned any stock in plaintiff; that the estate of said Miller was administered upon and final distribution thereof made in 1912, and that no stock of plaintiff was ever inventoried and the administrator of said estate did not know that said Miller was a stockholder in the plaintiff; that "Margaret Miller, a daughter of Thomas Miller, visited in Salt Lake City, Utah, about 1903, hearing that her father had an interest in a mining claim, but not knowing that his interest consisted of shares of stock in the plaintiff mining company, inquired of Thomas V. Jones at that time about the matter, and he told her that they were not shipping any ore from the premises, but if they ever did anything with it that the heirs of Thomas Miller would be protected." It is also alleged that one Robert Jones, an heir of said Thomas B. Jones, had instituted a suit in May, 1917, for the purpose of appointing a receiver for the plaintiff, but that the same failed because no legal service could be made upon it. It is also alleged in general terms that all the stockholders had exercised due diligence in instituting an action and that none of them had any notice of the wrongs that were perpetrated by the defendants Price and Reamer with respect to the property in question. There are some other allegations which are material to which special reference will be made in the course of the opinion. There are also some additional allegations to which I have not specially

referred, but they are merely conclusions and have no controlling influence here.

The record shows that a demurrer to a former complaint had been overruled and an answer duly filed; that thereafter the case was transferred to another judge who, without a withdrawal of the answer (as he might do), entertained the demurrer now in question namely, that the complaint does not state facts sufficient to constitute a cause of action, that the action is barred, and that the plaintiff cannot recover on account of laches, and sustained the same. It also appears from the record that a patent was obtained by Price and Reamer for the claim in question in December, 1906. In view, however, that it is expressly alleged in the complaint that Price and Reamer obtained the legal title to said claim and that in 1906 they conveyed the same to the company, who is now holding the legal title, the record referred to is of no importance except by way of explaining plaintiff's contentions, since it is not claimed that fraud was practiced against the United States in obtaining the legal title, but plaintiff confirms the legal title obtained by Price and Reamer and conveyed to the company by them, and prays judgment that the same be conveyed to it.

The plaintiff appeals from a judgment dismissing the complaint and assigns the ruling of the court in sustaining the demurrer as error.

The statute upon which defendants rely, Comp. Laws Utah 1917, section 6468, subdiv. 4, provides that "an action for relief on the ground of fraud or mistake" shall be begun within "three years; the cause of action in such case not to be deemed to have accrued until the discovery by the aggrieved party of the facts constituting the fraud or mistake." In considering whether this action is barred, it is important to keep in mind: (1) The relationship of the corporation directors to their corporations; (2) the character and condition of the mining claim which is the subject-matter of this action; and (3) the dormant condition and utter inactivity of the plaintiff corporation and the stockholders for

a period of fifteen years or more preceding the beginning of this action.

While corporation directors are constantly spoken of as trustees, they are not trustees in the true sense of that term. They are the managing agents of the corporation, and, as such, sustain a fiduciary relation both to it and to the stockholders collectively, and in case they wrongfully deal with or appropriate the money or funds of the corporation they may be charged as trustees with respect to such property precisely the same as any other agent or person who sustains a fiduciary relation to his principal may be charged. Corporation directors are therefore not trustees of an express trust by virtue of their office, and hence cannot be subjected to the consequences arising out of that relation. Mr. Pomeroy, in his excellent work on Equity Jurisprudence (3d Ed. section 1088), defines the relation of corporation directors as being ''analogous'' to that of trustees. In section 1089 he more fully defines their status as that of managing agents and fiduciaries, and he there says that it is of the utmost importance to keep in mind the true relationship of the directors to their corporations, since the respective duties, rights, and remedies depend upon such relationship. The relationship of corporation directors to their principals, the corporations, is well and correctly stated in the case of *Wallace* v. *Lincoln Savings Bank*, 89 Tenn. 630, 15 S. W. 448, 24 Am. St. Rep. 625, by Mr. Justice LURTON, who subsequently became one of the Justices of the Supreme Court of the United States, in the following words:

"Directors are not express trustees. The language of Special Judge Ingersol in *Shea* v. *Mabry*, 1 Lea. 319, that 'directors are trustees,' etc., is rhetorically sound, but technically inexact. It is a statement often found in opinions, but is true only to a limited extent. They are mandatories; they are agents; they are trustees in the sense that every agent is a trustee for his principal, and bound to exercise diligence and good faith; they do not hold the legal title, and more often than otherwise are not the officer of the corporations having possession of the corporate property; they are equally interested with those they represent; they more nearly represent the managing partners in a business firm than a technical

trustee. At most they are implied trustees in whose favor the statutes of limitations do run. *Hughes* v. *Brown*, 88 Tenn. 578; *Spering's Appeal*, 71 Pa. St. 11, 10 Am. Rep. 684; Morawetz on Private Corporations, section 516."

That statement is approved and quoted by Mr. Fletcher in his recent work entitled Fletcher's Cyc. Corps. (volume 4, section 2261). The doctrine is also approved by Mr. Thompson, in his work on Corporations (2d Ed. vol. 2, section 1176). The doctrine is also throughly supported in 3 Clark and Marshall, Private Corps., section 747, in these words:

"It is sometimes said that the directors, trustees, and other officers of a corporation are trustees for the corporation, or for the stockholders collectively, and in a certain sense that is true. They are not 'trustees,' however, in the strict sense of the term. Properly speaking, the relation is that of principal and agent, and the liability of directors and other officers of the corporation for mismanagement is determined by substantially the same principles which determine the liability of any other agent to his principal for failure to perform the duties which he has undertaken. 'The liability of officers to the corporation for damages by negligent or unauthorized acts rests upon the common-law rule which renders every agent liable who violates his authority or neglects his duty to the damage of his principal.' "

In section 755, subdiv. f, the authors further say:

"Some of the courts have held that the relation between the directors and other officers of a corporation and the corporation or the stockholders collectively is that of trustee and cestui que trust to such an extent that the statute of limitations does not run against a suit in equity against them to compel them to account or pay damages for misapplication of assets or mismanagement, at least until they have ceased to occupy the relation. This view, however, is contrary to the weight of authority. Properly speaking the relation between a corporation and its officers is not that of trustee and cestui que trust, but is that of principal and agent, and in most jurisdictions the statute of limitations applies both to actions at law and suits in equity to compel officers to account for assets misappropriated by them, or to hold them liable for losses caused by their wrongful or unauthorized acts, or by their negligence. The statute, when applicable, will not begin to run until the corporation has knowledge of the fraudulent or wrongful acts and the knowledge of the guilty officers is not imputable to it.

"An action by a corporation against its officers to hold them

liable for losses on the ground of mismanagement may be barred by laches or the corporation may be estopped by having consented to or acquiesced in the acts complained of. And individual stockholders may be estopped to sue by reason of the participation or acquiescence, or by laches."

In 1 Beach on Trusts and Trustees, section 191, the author lays down the doctrine that directors may be charged as "constructive trustees." To the same effect is 1 Perry on Trusts, section 430. Indeed, there is not a single text-writer, so far as the writer is advised, that does not lay down the same rule.

Plaintiff, in its brief, states:

"At the time of the commitment of the fraud, Jones was a director and the only director of the company."

That did not make him a trustee of an express trust. He was not such by virtue of his office, and there certainly are no facts alleged from which such a relationship can be deduced. There is therefore no question of an express trust in this case, and the statute of limitations is applicable here precisely as in any other fiduciary relations out of which constructive or implied trusts arise. In all such cases the statute begins to run from the time the complaining party discovered the wrongs complained of or when he was apprised of such facts and circumstances with respect thereto as would put a person of ordinary intelligence and prudence upon inquiry. The law is stated to that effect by this court in the case of *Gibson* v. *Jensen,* 48 Utah, 248, 158 Pac. 426, and in *Salt Lake City* v. *Investment Co.,* 43 Utah, 181, 134 Pac. 603. If therefore the facts and circumstances which came to the knowledge of the plaintiff corporation were such as would have caused a person of ordinary prudence and intelligence to act, then it should have acted, and the statute of limitations was set in motion as to it. This is so quite apart from the doctrine of laches which is always an important element in actions like the one at bar and which is relied on by defendants.

While in actions at law the statute of limitations absolutely fixes the time within which actions may be brought,

such is not necessarily the case in equity.   The doc-        **3**
trine of laches is not based upon time alone.   The gen-
eral doctrine is well and tersely stated in 10 R. C. L. section
142, p. 395, in the following words:

"It is a familiar doctrine that, apart from any question of stat-
utory limitation, courts of equity will discourage laches and delay
in the enforcement of rights.   The general principle is that nothing
can call forth the court of chancery into activity but conscience,
good faith, and reasonable diligence.  Where those are wanting, the
court is passive and does nothing.   The doctrine is founded prin-
cipally on the equity maxims, 'he who seeks equity must do equity,'
'he who comes into equity must come with clean hands,' and 'the
laws serve the vigilant, and not those who sleep over their rights,'
and is based on considerations of public policy.   Its object is in gen-
eral to exact of the complainant fair dealing with his adversary,
and the rule was adopted largely because after great length of time,
from death of parties, loss of papers, death of witnesses, change of
titles, intervention of equities, or other causes there is danger of
doing injustice, and there can be no longer a safe determination of
the controversy."

The doctrine of laches, therefore, rests upon the purest
principles of equity.

While courts may not approve of what may have been
done, if done wrongfully, they, nevertheless, refuse relief
because the complainant did not exercise reasonable diligence
in enforcing his rights and has permitted them to become
stale and unenforceable.   The doctrine is enforced in the
case of *Patterson* v. *Hewitt*, 195 U. S. 309, 25 Sup. Ct. 35,
49 L. Ed. 214.   In that case there was an express trust which
related to a mining claim, Mr. Justice BROWN, speaking for
the court, in referring to the diligence that is required upon
the part of claimants of mining property, and in discussing
the doctrine of laches, at page 321 of 195 U. S., at page 38
of 25 Sup. Ct. (49 L. Ed. 214), used the following language:

"There is no class of property more subject to sudden and violent
fluctuations of value than mining lands.   A location which to-day
may have no salable value may in a month become worth its mil-
lions.   Years may be spent in working such property apparently to
no purpose when suddenly a mass of rich ore may be discovered,
from which an immense fortune is realized.   Under such circum-
stances, persons having claims to such property are bound to the

utmost diligence in enforcing them, and there is no class of cases in which the doctrine of laches has been more relentlessly enforced."

Counsel for plaintiff, however, strenuously insist that the statute of limitations has no application in this case and that laches cannot be invoked against their client because of its legal status. They, in their brief, assert: ''The company [plaintiff] had existence, but it was absolutely paralyzed.'' Further, that because there were no directors or officers the plaintiff was utterly impotent, and, while it always retained its rights as a corporation, yet no duty was imposed upon it, nor upon the stockholders, to act, and no notice of any kind or character can be imputed to it or to them. This contention is based upon the alleged fact that plaintiff was without directors and officers and had entirely ceased to transact business. That fact, however, did not deprive it from being a corporation and continuing to exist as such. In 2 Mor. Priv. Corp. section 1004, the law is stated to be:

"The company still continues to be a corporation. in the eye of the law, and may sue and be sued in that capacity."

In 5 Thomp. Corp. section 6479, it is said:

"It has been many times decided by the various courts of this country that there is no dissolution by death, ineligibility or withdrawal of the corporate officers, or by a failure to elect officers for any period of time, so long as there are members having the power under the charter or governing statute to elect officers."

To the same effect are sections 6487, 6489, and 6492.

Now, if, as is contended by plaintiff's counsel, the stockholders had the power to elect new officers in 1917, they necessarily possessed that power all the time from 1901, when, it seems, there already were vacancies on the board of directors. It is utterly untenable to insist that the stockholders had such power in 1917, but were impotent during all of the preceding years from 1901 forward. If the corporation had a legal existence for the purpose of keeping intact all of its legal rights, it of necessity must also have existed for the purpose of enforcing them by suing in the courts, just as is stated in the authorities; but, if it lacked the necessary agents to sue, it nevertheless was the duty of the stockholders to elect them. Mr. Cook, in his

great work on Corporations, in volume 2 (7th Ed.) section 631, in referring to what constitutes a dissolution of a corporation so that it cannot be sued or cannot sue, says:

"There are acts and facts which do not in themselves constitute a dissolution. A dissolution is not effected by a failure to elect officers; * * * by a cessation of all corporate business and acts; nor by the death of its stockholders. * * *"

In *Carnaghan* v. *Exporters' & Producers' Oil Co.*, 11 N. Y. Supp. at page 174,[1] in speaking of the effect of a corporation becoming dormant because it has ceased to do business, it is said:

"The company still continues to be a corporation in the eye of the law, and *may sue and be sued in that capacity.* * * *." (Italics mine.)

To the same effect is *Evarts* v. *Killingworth Mfg. Co.*, 20 Conn. 447. In 4 Fletcher, Cyc. Corp. section 2930, after stating that a "want of officers does not affect the capacity of the corporations to be sued," it is further said:

"Obviously the total lack of officers would produce a state of inability to sue due to the want of corporate organs. Either a stockholder's suit in behalf of it or one of the last-elected officers holding over would seem to be the proper practice in such a case."

All this simply goes to show that the stockholders of the corporation may not permit it to become and remain dormant and insist that their own inaction constitutes an answer to the plea of the statute of limitations or of laches. Such a doctrine would necessarily result in permitting the stockholders not only to successfully defend as against all laches, but they could at will extend the statute of limitations for any length of time they desired. If the corporation exists as a legal entity and possesses the right to invoke the aid of the courts at all times, as pointed out by the authorities, but fails or is impotent to do so by reason of the lack of directors and the stockholders may at any time elect the necessary agents to institute an action, or, if they choose, may bring one in their own name or in the name of any one of them in behalf of the corporation, it must necessarily fol-

---

[1] Reported in full in the New York Supplement; reported as a memorandum decision without opinion in 57 Hun. 588.

low that those stockholders cannot shield themselves behind their own inaction. The plaintiff may have become dormant, but if it did it was the fault of the stockholders, and hence they cannot gain an advantage upon the one hand and escape legal consequences upon the other by reason of such fault.

By what I have just said I have not been unmindful of the fact that it is alleged that the Miller heirs did not know that their father was a stockholder in the company and that they did not learn of that fact until the books were found, and that substantially the same excuse for the Jones heirs is alleged. It is also alleged that Miller and Jones "practically owned all of the stock" of the company. If it be conceded that the Miller heirs can excuse themselves for not investigating into their, father's affairs for more than fifteen years after his death, no such excuse is available on behalf of the Jones heirs. Plaintiff's counsel have, however, failed to account for all of the stockholders. No doubt they attempt to do that by alleging that Miller and Jones "practically owned all of the stock." As a pleading the term "practically owned all of the stock" is not only a very loose and unsatisfactory way of stating a fact but it is very uncertain. All that can be asserted with any degree of certainty with respect to it is that it means less than all. It may, however, mean a considerable quantity less than the whole and it may even mean much less, all depending upon whether the capital stock was divided into a large or a small number of shares. In case the capital stock were divided into a million or more shares, 800,000 or 900,000 or 950,000 shares might be considered as "practically all." Be that as it may, however, we must take judicial notice of the fact that under our statutes Mr. Miller and Mr. Jones could not have been the sole incorporators of the Jones Mining Company and thus could not have subscribed for or owned all of the stock. There must have been some additional stockholders who are not accounted for. The attempt is made, however, to make that fact immaterial by the allegation that by reason of the fact that Mr. Price and Mr. Reamer had

concealed their acts neither the heirs of Miller nor the heirs of Jones, nor any of the other stockholders, had any knowledge regarding the claims of Price and Reamer. . For reasons hereinafter stated, however, it will appear that the law imputed notice to them, and hence the allegation is without force or effect.

If therefore it is desired to arrive at a just and equitable result in this case, it is important to keep in mind the real facts and circumstances and the true relationship of the parties. The controlling facts and circumstances of this case, as they are alleged in the complaint, and as conceded in counsel's brief, relating to the question of diligence, are in substance as follows: Mr. Jones, in 1902, was the sole director of the plaintiff corporation. For how long a time prior thereto he was such is not disclosed. It is alleged, however, that one Thomas Miller was the principal stockholder of such corporation, that is, that he owned the majority of the stock and that he died in September, 1901. If, as is conceded, there was but one director in the year 1902, we may well assume that that condition existed during the latter part of Mr. Miller's life and that the stockholders, even during that period, no longer complied with our statute in electing directors but permitted the corporation to become dormant, or "go to sleep" as suggested by plaintiff's counsel. That condition continued uninterrupted for a period of more than fifteen years, when, according to plaintiff's counsel, the corporation was awakened from its protracted slumber and upon looking around discovered that it had been grievously defrauded in the year 1902. Plaintiff's counsel base their whole claim in meeting the plea of the statute of limitations and of laches upon the fact that the corporation became dormant and remained so for more than fifteen years. This claim, no doubt, is prompted by the necessities of the case. If that claim fails, then all fails. What are the facts that are alleged and are necessarily implied from those that are. alleged in respect to the character of the property in question?

It is alleged that the plaintiff was the owner of a certain

mining claim and that the location notice was duly recorded in the public records of Salt Lake county as provided by law. It is further alleged that the defendants Reamer and Price, in collusion with Jones, who subsequently, in 1905, died, relocated said claim in September, 1902, and that the boundaries and description of the claim as relocated were identical with the boundaries and description of the claim of the original location and that the notice of relocation of said claim was likewise recorded in the public records of said county as provided by law. It is further alleged that in 1906 "said Price and Reamer were holding the legal title to said property as trustees in trust for the benefit and use of the Jones Mining Company of Utah." Then it is further alleged that in December, 1906, said Price and Reamer "conveyed to the defendant Cardiff Mining & Milling Company the entire interest in said Mountain Chief mining claim [the claim in question in this action] and said company received it and based its organization with other claims on said Mountain Chief mining claim, and the defendant Cardiff Mining & Milling Company now holds the legal title thereof," which title, it is alleged, it obtained with notice and therefore is not an innocent purchaser. It is further alleged "the ground covered by the Wrexim mining claim is the same and is the identical ground covered by the Mountain Chief mining claim," and, further, "the Mountain Chief mining claim is designated by the Surveyor General as lot 5332," and that the same was "recorded at 9:40 a. m. in book z of mining deeds, pages 114, 115."

If the boundaries and description of the claim as relocated by the defendants Reamer and Price, and for which a patent was obtained, are identical with those of the original location and the relocation notice was recorded as provided by law, then there was absolutely no concealment either attempted or effectuated by them in making the location. A mere casual examination of the records would at once have disclosed that the new location covered precisely the ground covered by the original location. The plaintiff and the stockholders certainly were charged with notice of the description

and boundaries of the claim as originally located and of which plaintiff alleges it was in possession in 1902. Plaintiff therefore had ready means of learning just what was claimed by the defendants as early as 1902. In view that the plaintiff alleges that it had no knowledge of the collusive agreement entered into by Mr. Jones on the one hand and by Reamer and Price upon the other, the notice of relocation was notice to it, as it was to all the world, that the defendants who relocated the claim did not locate it for its benefit but did so on their own behalf and for their own benefit. The case in this regard, therefore, is not like the case of an express trust where the trustee transacts business in his own name but for the use and benefit of his cestui que trustent. If therefore the record of the location notice was constructive notice to the whole world of what defendants claimed, it necessarily was also constructive notice to the plaintiff and to the stockholders. Moreover, it is alleged that the defendant mining company subsequently acquired from Price and Reamer and now holds the legal title to said mining claim. We are required to take judicial notice of how and under what law the title to lode mining claims may be obtained from the government of the United States. In applying for a patent to the mining claim, the applicant was required to make an official survey and plat of the claim and to file the same with a complete description and an abstract of title, showing the source of title, in the land office of the United States at Salt Lake City and to post the same in a conspicuous place upon the mining claim and in said land office, and, further, to publish notice of the application for patent, with the description, etc., of the mining claim in a newspaper. The notices aforesaid were required to be kept posted and the notice was required to be published in a newspaper for the specified length of time. All this had to be done openly and in a manner to apprise every one who had or claimed any interest in or to the mining claim in question that the patent was being applied for and for whose use and benefit. Here again, in view that there was no express trust whereby it was agreed that the acts that were being done, while done

in another's name, were, nevertheless, done for the use and benefit of the plaintiff corporation, it, like all the world, was required to take notice of the claim of the applicant for patent. If the acts of the patent claimant were notice to all the world, they certainly were notice to plaintiff. Can any one doubt that in view of the publication of the notice and the posting of the plat and notice upon the claim, etc., in applying for a patent, any one who claimed an interest in or to the mining claim adversely to the patent claimant would have to file an adverse claim as required by law and in default of that would waive his right to the claim?

It is true that, in case certain legal relations exist between the applicant for a patent and the one claiming either the whole or only an interest in the mining claim, such as tenant in common, or as a trustee of an express trust, or where a claimant furnished the money to the applicant for the patent and the latter agreed to or legally is required to act for the claimant in obtaining it, no adverse claim need     7, 8 be made. Such is not the case here. Here the alleged trust, if any existed, was based entirely upon the alleged mala fides of Jones, Reamer, and Price. Their acts relating to the mining claim, as I have shown, were, however, not concealed, but, upon the contrary, were all open and done precisely in the same manner as all other similar acts are required to be done by law.

Nor was there any agreement, either expressed or implied, so that the plaintiff had a right to assume that what was being done should inure to its benefit. If Reamer and Price were wrongdoers, their acts were open and were such that all the world could know them, including plaintiff. What is true respecting the acts of Reamer and Price in that regard is also true of the defendant company. Moreover, the applicant for patent paid the government price for the land. All expenses incident to obtaining the patent and the expenses of placing the necessary improvements upon the mining claim after relocation to entitle the claimant to a patent, had been paid by such claimant. The plaintiff now comes into a court of equity, and, without alleging facts constitut-

ing an express trust or agreement equivalent to such a relation, and without offering to repay the government price which was required to be paid for the mining claim, and without offering to reimburse any one for the costs and expenses incident to obtaining the patent from the United States, and without offering to do equity to any extent, coolly demands the title to said mining claim. The whole basis of such a claim is, and of necessity must be, the alleged fact that the plaintiff corporation, many years ago, became dormant and while in that condition all those things transpired and hence no laches can be imputed to it and the statute of limitations does not run because the plaintiff did not know of the acts complained of.

In this connection it is, however, also alleged as an excuse on behalf of the stockholders and why they did not act sooner that "the books and records of said plaintiff company became lost about the year 1901 and were not found until about the year 1917." This statement, like numerous others in the complaint, is about as uncertain as it well could be made. In whose possession were the books prior to and in "about the year 1901"? In whose possession were they found, and by whom? Was there any search of any kind ever made for the books? If so, by whom, when, and in what place or places? As the statement stands it might all be true and yet the books might have been accessible at any time if any reasonable effort had been made to find them. Indeed, they might have been in the possession of a stockholder all of the time or at the place where they had been kept prior to 1901. In the absence of any statement of diligence or of any search of any kind, the statement as it stands is without force or effect.

Of the same character is the statement that neither the plaintiff nor any of the stockholders had any knowledge or means of knowledge that the mining claim was being claimed by Price and Reamer. We must take judicial notice of the law that lands of the United States bearing metalliferous ores can be acquired only by means of development, and improvements must be made annually either on the partic-

ular claim or on some contiguous claim, and if not made on the claim notice must be posted on the claim at what place the work is being done or improvements are being made. The original locator is thus always apprised of anything that is being done upon his claim. In view, therefore, of the duty imposed on him by law, may he without any express agreement with any one that the representation work is being done on his claim for his benefit, remain away from it and deliberately close his eyes for years and after some one has developed his claim and obtained legal title thereto from the United States go into a court of equity and say:

"True, I have done nothing; I have not complied with the mineral laws and regulations of the United States, and have made no effort, to do so; I have in no way developed the mineral resources of the government as contemplated by law, but I am, nevertheless, entitled to have the legal title which the government has conveyed to another declared to be held in trust for me."

A mere statement of the proposition is its best refutation.

I have shown, however, that the acts of the defendants were done in such a manner as to impute constructive notice to the world. If that be true, how can plaintiff or the stockholders escape? Can the stockholders, who are the beneficiaries of the corporation, permit it to go to sleep and continue to slumber peacefully for a period of fifteen years and then revive it for the sole purpose of "winding up its affairs," as is alleged, and after such a revival go into a court of equity and claim the property and in doing so defeat the pleas of the statute of limitations and laches by claiming want of knowledge on the part of the corporation of the alleged wrongful acts for the sole reason that it, like Rip Van Winkle, slept while others toiled? If such is the law, then the longer the stockholders permit the corporation in which they are interested to remain dormant the better is their chance to reap a rich reward. The longer they wait the more likely it will be that something will happen which will make the property in which the corporation claims an interest either directly or indirectly more valuable. Suppose

the stockholders as individuals were claiming an interest in the mining claim in question. Would any one seriously contend that the acts hereinbefore detailed, all of which had to be and were done openly and in the name of the real claimant, were not such as would put them upon notice or inquiry? Clearly not. Can the same individuals, therefore, accomplish indirectly by claiming through the corporation what they could not accomplish for themselves for the reason that the facts and circumstances are such as to put them upon notice and inquiry- and for that reason the statute of limitations had run? If they can, then there are not only scores but there are hundreds of dormant corporations which can be revived for the ostensible purpose of "winding up their affairs" and claim an interest in some property, directly or indirectly, which has become valuable through the efforts of others and which may successfully be claimed through the revived corporations and distributed among the stockholders who are in fact the real parties in interest.

I most respectfully submit, therefore, that the rule contended for is a most dangerous one, since it opens the doors of our courts of equity to all enterprising stockholders who were either too careless or too indolent to keep their corporations alive and going concerns. The doctrine does not encourage activity and vigilance, but places a premium on indolence and carelessness. Moreover, it makes a court of equity a sort of prize court where one may reap where he has not sown. While I most heartily concur in the proposition that corporation directors are to be held to a very high degree of integrity and fidelity in the discharge 11, 12 of their duties, and while I also unhesitatingly assert that a court of equity should not permit a wrongdoer to profit by his wrong, I, at the same time, also recognize the fact that a court of equity should always insist upon reasonable diligence and not encourage stale claims and thus open the doors of our courts to those who have slept upon their rights. The whole difficulty with this case 13 is that counsel for plaintiff have clothed the facts and circumstances with legal and equitable consequences which

are not justified. Then counsel assume that Jones was a trustee of an express trust, which, as we have seen, is not the case. It is also asserted that the defendants may be charged as trustees. The assertion is necessarily based upon the assumption that Jones was a trustee and that the defendants claim under or through him, or that they, in some way or by some means, obtained something from Jones as such trustee which belonged to the plaintiff. The fact is however, that Jones had nothing that he could give or barter. Jones did not hold the title to anything; nor did he in any way use, or permit Reamer and Price to use, any corporate funds in doing what they did. Nor did Reamer and Price enter into any promise or agreement with the plaintiff to do anything on its account or behalf and hence practiced no deception upon it. When the whole transactions complained of are stripped of unnecessary verbiage, . they, in effect, amount to this: Plaintiff in 1902 had a possessory right to a certain mining claim the title to which was in the government. Reamer and Price, with the consent of Jones, wrongfully relocated the claim and went into possession thereof and hence dispossessed the plaintiff. The relocation, however, was made openly and the notice thereof was recorded in the public records of Salt Lake county. There was no agreement or understanding, either express or implied, with the plaintiff, nor with any one acting for it or on its behalf, that the relocation was being made for its use and benefit, or that it was not made precisely for the purpose indicated by the notice of relocation. Neither was it done with the plaintiff's funds. It is therefore a plain case of one person having a possessory right to government mineral lands from which he is dispossessed by another and where the acts resulting in the dispossession are done openly and are hostile to the rights of the possessor from their inception, and where the title to such lands is afterwards acquired by the wrongdoer but which is also acquired openly and without any deception or misrepresentation which could have in any way misled the original possessor. In this case the plaintiff was thus openly dispossessed of its property in 1902.

Title was thereafter obtained from the government by paying the full consideration for the mineral land in the usual manner that all such titles must be obtained, which is openly and with notice to the whole world. The transactions in this case, therefore, are no different from those in any case where possession is wrongfully taken from one entitled to possession and the title is thereafter acquired by the wrongdoer from the original owner, except that in this case the act by the wrongdoer was openly done. While the courts afford relief in all proper cases where property has been wrongfully taken, yet the same law respecting the remedy applies in case of mineral lands that applies to other lands. Here although the alleged wrongful acts were openly done and without any deception, no action was commenced until at least fifteen years had elapsed from the time the alleged wrongful act was committed. While the courts in such cases do not approve the alleged wrongful acts, they, nevertheless cannot grant relief under the guise of trust relations which do not exist, and hence they are compelled to enforce the law as they find it.

In any view that can be taken, therefore, this action is clearly barred by the statute of limitations, and hence the judgment should be affirmed. In view that the majority of the court concur in the foregoing views, the judgment is affirmed, with costs.

CORFMAN, C. J., and THURMAN, J., concur.

GIDEON, J. (dissenting). The defendants separately demurred to the amended complaint on the following grounds: (1) The complaint does not state facts sufficient to constitute a cause of action. (2) The cause of action attempted to be stated is barred by the statute of limitations and laches. The district court sustained the demurrer of each defendant on the ground that it affirmatively appears from the complaint that the cause of action is barred by the statute of limitations and that plaintiff is chargeable with laches.

The following controlling facts appear from the allegations

of the complaint and are set out in the opinion of Mr. Justice FRICK:

(a)  In the year 1902 plaintiff was the owner and in possession, subject to the paramount title of the United States, of the mining claim in question.  The notice of location of said mining claim was recorded in the county recorder's office of Salt Lake county in 1891, and the annual assessment work upon said claim had been performed to and including the year 1901.

(b)  In the year 1902 Thomas B. Jones, now deceased, was a director, and the sole director (unless the defendant Reamer was a director), of the plaintiff.

(c)  In the year 1902 the said Jones, together with the defendants Reamer and Price, entered into a fraudulent conspiracy to relocate the mining claim in the name of Reamer with a view of defrauding plaintiff of its interest therein. Said Jones died in 1905.

(d)  One Miller, who died in 1901, and whose family resided in the state of New York, owned a majority of the capital stock of the plaintiff company and was its first president.

(e)  The fact of the plaintiff's interest in this mining property was concealed from both the Miller and Jones heirs (1) by Jones in 1903 when he advised one of the Miller heirs, who was temporarily in Utah, that their interests would be protected; (2) by Reamer in failing as the executor of Jones' will to report to the court or to the heirs of the estate that the estate owned any stock in plaintiff company or had any interest in this mining property.

(f)  The defendants Reamer and Price, and likewise the defendant mining company, were cognizant at all times of the plaintiff's interest in the mining property and of the fraudulent conspiracy entered into in 1902 by Jones and the defendants Reamer and Price to deprive plaintiff of such interest.

(g)  The fraud or conspiracy was not discovered until the year 1917.

(h)  There has been no change in the property by reason

of the expenditure of money so as to render the claim of the plaintiff inequitable or unjust as against the claims of the defendants.

(i)   No evidence of the transactions has been lost by the lapse of time.

(j)   The stockholders of plaintiff had no knowledge of their interest in the mining property, and the fact that they had any such interest was withheld from them by the fraudulent acts of the defendant Reamer and the director Jones, his coconspirator.

(k)   No innocent third parties have acquired any interest in the property, or, if so, their interest is not superior to the equity of the plaintiff.

Whatever diversity of opinion may have been expressed by the courts and text-writers respecting the relationship of directors to corporations, it is agreed by all that that relationship is one of a fiduciary character.

The conclusions deducible from the authorities is succinctly stated by the author in 4 Fletcher, Cyc. Corps. 3509, as follows:

"But whether or not directors and other corporate officers are strictly trustees, there can be no doubt that their character is that of a fiduciary so far as the corporation and the stockholders as a body are concerned. In other words, it is unquestionably true that, as agents intrusted with the management of the corporation for the benefit of the stockholders collectively, they occupy a fiduciary relation, and in this sense the relation is one of trust."

It is alleged that neither the director Jones nor either of the defendants ever, at any time, renounced the trust or gave any notice to the plaintiff or its stockholders that they were claiming the mining property adversely to the interests of plaintiff company, unless the relocation in 1902 by Reamer under the conspiracy alleged be held to constitute such renunciation. Jones, standing in a fiduciary relationship to the plaintiff, and to that extent being a trustee of this property, and the defendants Price and Reamer, with knowledge of that fact, having entered into a conspiracy with Jones to defraud the plaintiff, it follows that Reamer and Price took such property burdened with the same trust in favor of the

plaintiff company as had existed between Jones as a director
and the plaintiff company. "It is a universal rule, that if
a man purchase property of the trustee, with notice of the
trust, he shall be charged with the same trust in respect to
the property as the trustee from whom he purchased."
Perry, Trusts (6th Ed.) section 217. This principle was
adopted by this court in *Schenck* v. *Wicks*, 23 Utah, 576, 65
Pac. 732. The second headnote in that case, which reflects
the opinion, is as follows:

"Where a person purchases property from the trustee, with no-
tice of the trust, he is charged with the same trust in respect to the
property as the trustee from whom he purchased."

See, also, 2 Pom. Eq. Jur. (4th Ed.) section 688; *Gautier*
v. *Douglass Mfg. Co.*, 13 Hun (N. Y.) 514.

It may be stated as a general principle upon which there
is no conflict of authority that—

"Whenever a person obains the legal title to land by any artifice
or concealment, or by making use of facilities intended for the
benefit of another, a court of equity will impress upon the land so
held by him a trust in favor of the party who is justly entitled to
them, and will order the trust executed by decreeing their convey-
ance to the party in whose favor the trust was created." *Felix* v.
*Patrick*, 145 U. S. at page 328, 12 Sup. Ct. 865 (36 L. Ed. 719).

True it is that courts will not encourage nor lend aid to
the enforcement of stale claims; but that aid is refused, not
because the courts condone the wrongs out of which the
claims arose, but because it is often and is generally more
inequitable to disturb present vested rights than to leave
stale claims unenforced. The grounds on which such refusals
are usually based are loss of evidence, expenditure of money,
change in the condition of the property, innocent parties
having acquired an interest in the property, or, possibly, such
increase in its value by reason of improvements that it would
be inequitable to enforce prior existing rights. 16 Cyc. 152
*et seq.* Under the allegations in this action, which this court
must accept as true with all necessary intendments, none of
these elements exist. If the allegations of the complaint are
true, the property is still in the same state of nature as it
was at the time of the alleged conspiracy. No innocent third

parties have acquired any interest in the property. Two of the parties to the original conspiracy, if any conspiracy existed, are defendants here and are still living. Their testimony can be obtained. It is reasonable to suppose that if Reamer violated his agreement, as alleged in the complaint, to reconvey this property to Jones within one year after relocation, Jones' testimony would be more favorable to the plaintiff than to the defendant, so that by reason of Jones' death defendants are not deprived of any testimony that would likely be in their favor. Moreover, both Reamer and Price knew of the existence of the conspiracy, if one existed, and their testimony can be obtained as they are both defendants in this action.

It is provided in the statute quoted in the opinion of Mr. Justice FRICK that a cause of action for relief on the ground of fraud or mistake is not deemed to have accrued until the discovery by the aggrieved party of the facts constituting the fraud or mistake. It is affirmatively and repeatedly alleged in the complaint that the alleged fraud was not discovered until the year 1917. If therefore the action is to be defeated, it must be upon the ground of laches. The defense of laches in every case must be determined by its own particular facts. There is no conflict in the authorities upon that point. The defense of laches "rests upon the ground that the equity of the respondent arising from the acts or acquiescence of the plaintiff is greater than the equity set up in the complaint." In 4 Pom. Eq. Jur. (4th Ed.) section 1442, the author quotes with approval the following language from *Wilson* v. *Wilson*, 41 Or. 459, 69 Pac. 923:

"If, however, upon the other hand, it clearly appears that lapse of time has not in fact changed the conditions and relative positions of the parties, and that they are not materially impaired, and there are peculiar circumstances entitled to consideration as excusing the delay, the court will not deny the appropriate relief, although a strict and unqualified application of the rule of limitations would seem to require it. Every case is governed chiefly by its own circumstances."

In section 1447 of the same volume the author again quotes

with approval the following from *Hall* v. *Otterson,* 52 N. J. Eq. 522, 28 Atl. 907:

"A person cannot be deprived of his remedy in equity on the ground of laches, unless it appears that he had knowledge of his rights. As one cannot acquiesce in the performance of an act of which he is ignorant, so one cannot be said to neglect the prosecution of a remedy when he has no knowledge that his rights have been invaded; excepting always that his want of knowledge is not the result of his own culpable negligence. It is not a little difficult to determine what knowledge is necessary to place the party in the position of negligently delaying his action."

See, also, section 1448 of the same volume.

None of the elements usually invoked to defeat stale or ancient claims are present in this action. To affirm the judgment of the district court closes the door not only against the Cardiff Mining Company but against Reamer and Price as well. If the allegations of the complaint are true, these two defendants have valuable property which ought to be the property of plaintiff and its stockholders. They were both active in concealing from the plaintiff the information that it or its stockholders had any interest in the property in controversy. No third party would be in any way affected or disturbed in requiring these defendants to account to the plaintiff for any gain realized by them growing out of the conspiracy entered into with the director of the plaintiff company. These defendants are still living. They can easily explain their acts, if there is an explanation, in connection with obtaining this property, and no injury would be done to any innocent party by permitting the court to hear the testimony and determine the facts.

The record, in my judgment, does not warrant the statement that the plaintiff now coolly comes into court and demands the title to the mining claim in question without offering to do equity. True it is that in the prayer the complaint asks that the defendant mining company be adjudged to hold the property in trust for the plaintiff, but, at the same time, the prayer is that if that cannot be granted the defendants Reamer and Price be required to account to the plaintiff for any stock they may have received from their

codefendant by reason of conveying this property to such codefendant. There is also a prayer for general relief. Under that state of the record, it is clearly within the power of a court of equity to require the plaintiff to do equity before granting any relief against any or all of the defendants. Accepting the allegations of the complaint as true, as we must, and, as the defendants by their demurrers admit, I do not believe a case can be found anywhere under a similar state of facts where plaintiffs have been denied a hearing upon the merits.

It is not contended by any one that the statute of limitations has not defeated plaintiff's cause of action unless the acts of the defendants have prevented it from running. Counsel for the plaintiff make no contention that the possession of this property would not defeat plaintiff's claims if the defendants had not entered into a conspiracy and concealed the fraud by which they obtained possession. True, obtaining a patent from the government is notice to all the world of that fact, but what court has ever held that a party who was not advised that he had any interest in the property for which patent was being obtained, and where the fact that he had such interest had been concealed from him by the party obtaining title, that such notice would put the statute of limitations in action? It is of little moment to argue and recite facts which would cause the statute of limitations to run. No one disputes that or makes any contention to the contrary, but I do contend that there is no authority to make such notice binding upon any one who is not cognizant of his interest and who has been kept in ignorance by the fraudulent acts of the conspirators who obtained the property. The facts in *Patterson* v. *Hewitt*, 195 U. S. 309, 25 Sup. Ct. 35 (49 L. Ed. 214), cited in support of the opinion of the court, are different from the facts here. In that case the plaintiffs knew of their interest in the property in question but did nothing to assist in the development work. and only attempted to assert their rights after valuable ore had been discovered by great labor and expenditure of money

by the defendants. The court in that case, in discussing laches, says:

"True, lapse of time is one of the chief ingredients, but there are others of almost equal importance. Change in the value of the property between the time the cause of action arose and the time the bill was filed; complainant's knowledge or ignorance of the facts constituting the cause of action, as well as his diligence in availing himself of the means of knowledge within his control, are all material to be considered upon the question whether the suit was brought without unreasonable delay."

It is doubtless true that the party defrauded must be diligent in making inquiry; likewise, that means of obtaining knowledge of facts that would put a prudent person upon inquiry is equivalent to knowledge, but "none of the cases holds, nor are we aware of any case elsewhere which holds, that a man must be so keenly on the scent of effort to defraud him that, without knowledge of any facts which would lead a prudent man to suspect that he has been defrauded, he is bound to make investigations which he is not obliged to make for other purposes, merely because it is within his power to make such investigations." *Raymond* v. *Schriever*, 63 Neb. 722, 89 N. W. 309.

In the opinion of the court the allegation respecting the loss of the books is discussed. The books, I assume, would naturally be in the hands of the officers of the company, since they are the legal custodians of the records of the company, and presumably were in the possession of the officers of the company in the year 1902. I regard that allegation as wholly immaterial, but the query naturally arises why should any stockholder who is not aware of the fact that he is interested in the corporation attempt to hunt up its records and be charged with laches by failing so to do?

It is suggested in the opinion of the court that if relief were granted to this plaintiff there may be others, even hundreds of corporations, which would shortly come to life and demand recognition in the courts in attempting to enforce some imaginary right. I assume that if there are other corporations which have been, by the fraudulent acts of their directors, deprived of their property, and the acts have been

such that the statute of limitations has not run, and the parties have not been guilty of laches, the courts ought to be open to permit those corporations to enforce such rights regardless of whether there may be a hundred or many hundreds of such cases.

In this state the powers of a corporation are exercised by a board of directors. Comp. Laws Utah 1917, section 871. It is a matter of common knowledge that in the management of corporate property the stockholders frequently know very little of the actual property owned and controlled by such corporation. This is especially true of mining companies. The promoters usually retain a majority of the capital stock of such companies. The remaining or treasury stock is sold to purchasers of small blocks and often in widely separated localities. Such stockholders seldom have any absolute knowledge of the location or nature of the property controlled by the company. The title to the land is usually in the general government, and a failure to do the annual assessment work leaves the property open to relocation. In such cases, if the directors and other officers are permitted to disregard the interests of the company and its stockholders, a gateway is left wide open for dishonesty. The facts alleged in this action are illuminating as illustrating the injustice that may follow any relaxation of the inflexible rule announced by all the courts that absolutely fair dealings by the directors in their relationship to the corporate property, either as agents or trustees, must be insisted upon. Parties fraudulently dealing with any one standing in the relationship that a director does to his corporation should be bound by the same rules that apply to the director.

It is insisted by respondent that the plaintiff is a corporation and that any acts of the defendants in concealing from its stockholders the fact that they owned stock or were interested in the corporation cannot be invoked as an excuse or justification on the part of the corporation for failing to institute this proceeding at an earlier date. True it is that the plaintiff is a corporation and as such has a legal entity independent of its stockholders, but it is likewise true that

as such it can act only through officers elected by the stockholders. Whether there are other stockholders in addition to the Miller and Jones heirs does not appear from the complaint. Jones, as the sole director, could have called a stockholders' meeting at any time prior to his death. Neither the Miller nor the Jones heirs knew of their ownership of stock until 1917. The facts were concealed from the Jones heirs by the failure of defendant Reamer to report such property as an asset of Jones' estate. Jones, one of the alleged conspirators, by his statement to one of the Miller heirs in the year 1903, lulled them into inaction by his statement that such heirs would be protected in any interest they might have in the mining property in which their father was interested.

The ultimate rights of the parties are not before this court for consideration in this appeal. The only question is whether, accepting as true the facts stated in the complaint, the action is barred by the statute of limitations or by laches of the plaintiff. In my opinion it is not. The allegations are such that the chancellor ought to hear the testimony and determine the rights of the parties from the facts so developed. I therefore dissent.

WEBER, J., concurs.