R. S. MYERS and M. L. GUTHRIE v. UNION ELECTRIC LIGHT & POWER COMPANY, a Corporation, Appellant.—66 S. W. (2d) 565.

Division One, December 22, 1933.

*Theodore Rassieur, George M. Rassieur* and *Alfred C. Wilson* for appellant.

*Baker & Baker* and *Rubey M. Hulen* for respondents.

HYDE, C.—This is an action for a balance of $9.941.20 claimed to be due under a contract for clearing timber in the Bagnell Dam reservoir. Defendant set up a counterclaim of $1,015.32 for work alleged to have been done by it to complete the contract. Plaintiffs obtained a verdict of $8,450. From judgment entered therefor, defendant has appealed.

The contract sued upon was made pursuant to the following advertisement:

"Advertisement No. 41.

"At 10 A. M., November 23, 1929, at the office of the Union Electric Light and Power Company, Stone and Webster Engineering Corporation, Agents, at Bagnell Dam near Bagnell, Missouri, sealed proposals will be received for clearing of reservoir area on the following tract of property:

"Parts of sections 14, 15, 22 and 23, T 40 N, R 16 W, on left bank of Osage River in vicinity of Birdsong School, Miller County, formerly owned by T. J. Howser, Jasper Howser and Lon Howard and more recently by Kansas City Joint Stock Land Bank, and *containing approximately 90 acres of clearing.*"

The specifications for doing the work were as follows:

"Class A. Clearing will include the area between a line 15′ outside of the 660 ft. contour and the 628 ft. contour, according to U.*S. Survey datum. In this area all timber, brush and floatable material is to be cut and burned clean. Stumps are to be not more than 12 inches high on up hill side. . . .

"Class B. Clearing will include the area below the 628 ft. contour. In this area timber is to be so cut that no portion is above elevation 628. Brush not extending above elevation 628 need not be cut, but the limbs from felled timber and all floatable material is to be burned. The logs of large trees that cannot be burned to advantage are to be securely anchored to live stumps, using No. 9 galvanized wire. 1½″ staples are to be used when necessary to keep the wire from slipping. . . .

"All work will be subject to inspection and direction of the engineers. *All areas will be measured* by the engineers upon completing of the clearing. . . . *Payments for the work done will be made semi-monthly on engineers estimate.* 85% of estimate will be paid to contractor and 15% retained until final inspection and acceptance by the engineers."

Plaintiffs made a written proposal containing the following statement:

"Having made a field inspection of the work to be done, I propose to clear reservoir area described in advertisement No. 41, dated November 14, 1929, in accordance with specifications dated September 23, 1929, for unit prices given below.

"Class A (above 628 ft. contour).

"Making no allowance for salvage $40.00 per acre. . . .

"Class B (below 628 ft. contour).

"Making no allowance for salvage $40.00 per acre."

Thereafter, a contract was entered into between plaintiffs and defendant, such parts of which are material to this controversy, and were as follows:

"2. The land to be included in this agreement, and hereinafter referred to as lands allotted to contractor, are described in Adver-

tisement No. 41, copy of which is attached hereto and made a part hereof.

"3. That the said work shall be performed by contractor in a good, proper and workmanlike manner without injury to adjacent lands, and *in such a way as to meet satisfactorily the requirements*, of the federal license granted to and owned by the Union Electric Light and Power Company for the construction and maintenance of a dam on the Osage River at or near Bagnell, Missouri, *as determined by the engineers and representatives of the United States* in charge of such matters. . . .

"7. It is further agreed and covenanted that if at any time during the continuance of the contract the Company is satisfied that the contractor is careless or incompetent, is not prosecuting the work with promptness or diligence, or is failing in any way to comply with this contract, its specifications, or drawings, the Company shall have the right, after having first given the contractor two days' notice in writing of such intention, to go immediately upon the work, exclude the contractor and his employees, retain or remove the contractor's tools and implements and enter into other contracts for the completion of said work or complete the work itself, retaining out of any moneys due the contractor a sufficient amount to reimburse the Company for any extra cost in the execution, or in recontracting for the execution of this work. . . .

"12. The Company agrees to pay to the contractor for work herein mentioned, upon terms herein set out, $40.00 per acre for Class 'A' clearing and $40.00 per acre for Class 'B' clearing, said payments to be made the contractor on semi-monthly estimates made on the first and fifteenth days of each month for all work completed within the next preceding semi-monthly period, in accordance with the preliminary inspection of the Company's representatives to the amount of 85% of the work set forth in said estimate, the final 15% to be paid to the contractor when the Company is finally advised that the work is acceptable to the representatives of the United States Government, and all possible claims, liens or charges have been paid and discharged. In making progress estimates the various clearing operations will be given the following weights: falling timber, 20%; piling brush and timbers, 40%; and burning, removal or disposal, 40%."

The real controversy between plaintiffs and defendant was over the basis upon which plaintiffs were to be paid. As stated in plaintiffs' brief, the issues were:

"Respondents contended that they were entitled to have measured to them the entire acreage on the three farms mentioned in the advertisement, which lay between the left bank of the Osage River and a line fifteen (15) feet outside of the six hundred sixty (660) foot contour line. The appellant contended that it was entitled to

pick out certain isolated spots, and say there was no clearing on these spots and deduct the acreage of these spots from the total area.".

Plaintiffs say that the total acreage of the whole area was 392.95 acres. Apparently there is no controversy about that. Plaintiffs further say in their brief:

"Appellant's engineer Chestnut told him (plaintiff) there were three hundred ninety-two and 95/100 (392.95) acres. This was not denied by Mr. Chestnut when on the witness stand. That this is the actual acreage on these three farms between the left bank of the Osage River and a line fifteen (15) feet outside of the six hundred sixty (660) foot contour line has never been disputed by appellant, but always conceded.".

Plaintiffs' evidence material to this issue was that the Class A clearing classification covered upland with many draws and ravines covered with brush and heavy timber with no bare spots. This area was from the shoreline of the lake at high water mark down to the 628-foot contour line. As to the condition of the land included in the Class B clearing classification below the 628-foot contour line, which would be the bottom of the lake, plaintiff Guthrie testified as follows:

"Part was timber, some had been in cultivation, part was covered with driftwood. The sloughs had caught drift logs. Some were as big as a sugar hogshead, some sixty feet long, some the size of a telephone pole, jammed in thick. The heaviest pile was about 300 yards long, extending from the edge of the river *into a cleared field*. I saw it when the men were cutting it up and burning it. They worked on that pile two weeks. The bottoms had been overflowed and there was an accumulation of driftwood and lumber, some sawed stuff, brush drifts with and without limbs piled up in the sloughs *over the cultivated land;* not a great deal of brush, but logs and chunks and drift. Some logs were in corn rows and had been plowed around. There was floatage practically all over the bottom lands. It had to be piled and burned."

Plaintiff Myers testified further about this area, as follows:

"The class B area was in the bottoms, below the other, from the 628 contour line down to the river. In this area there were drifts, timber and trees, mostly drifts in the bottom. We had to chop the drifts; they were scattered all over. We worked on them until we cleaned them up, taking a strip from ten to fifteen feet wide at a time, starting at the river and *going across the field.* It would be hard to say how much drift there was in area B. They were scattered in different places, some small, some big. There was driftwood in the draws and creeks and branches running into the river. Mr. Chestnut said everything as big as your wrist and a foot long had to be picked up. Anything that would float had to be burned."

It was described by defendant's engineer, Mr. Chestnut, as follows:

"The timber on the land before Myers and Guthrie started to work was a fair average of timber through that county; some heavy, some light, some underbrush. *There were fields in the tract, large corn fields and cultivated fields.* The land bordered the river and was generally river bottom land, flat land inundated during floods."

The testimony of other witnesses was that there were cleared and cultivated fields on the land covered by the contract.

Ten separate progress estimates were made by defendant's engineers and plaintiffs were paid eighty-five per cent of the amounts shown due them thereby. The final estimate was, as follows:

"Kind of work Clearing—Contract Dated 11/23/29.

| Description | Unit | Quantities | | Price | Amount |
|---|---|---|---|---|---|
| Clearing Reservoir | | | | | |
| Area Tract No. 41 | | Prev. to Mo. Total | | | |
| | | Current est. | | | |
| Class "A" | Acre | 68.4 | 68.4 | $40.00 | $2736.00 |
| 68.4 acres complete | | | | | |
| | | Prev. to Mo. Total | | | |
| | | Current est. | | | |
| Class 'B' | c.Acre | 14.4 72.4 | 86.8 | $40.00 | $3472.00 |
| 86.8 acres complete | | | | | |

Total 155.2 acres complete

This completes all work under this contract.

Approved for payment

Total to date ..................... 6208.00

O. W. Davidson

By W. S. F. 5/6/30 Less 15%—$500—Retained    431.20

_____

$5776.80

H. F. Anthony 5/6/30

Works Eng. Date Less Previous Payments    5287.20

Current Payment    489.60

K. R. Chestnut

Engineer."

When the area was inspected by the government engineers they refused to accept it. Defendant completed the work to comply with the requirements of the government engineer at a cost of $1,446.57. Defendant deducted from this the amount which the final estimate showed to have been retained from the amount due plaintiffs and made their counterclaim for the balance. Defendant now seems satisfied to limit its rights to the money withheld.

As to the engineers' estimates, the payments and the completion of the work to meet the government requirements, plaintiff Myers testified on cross-examination as follows:

"I saw the engineers there, but could not tell whether they measured or not, or what they measured. I kept complaining all the time about defendant paying too little and wanted it to pay all as we went along, but they said it would come out in the windup. I don't know that Mr. Chestnut measured some of the land. I knew the work had to be approved by the engineers from the War Department, but defendant had held back 15 per cent to do it with, they told me. I never had notice that they did not accept the work. In August or September I did have a conversation with Mr. Chestnut. He and I were talking about the Government having rejected the work. . . .

"I told Mr. Chestnut if he would pay me money enough to finish it I would finish it, and he said they would finish it themselves.

"Q. And they finished the job? A. Yes, sir.

"Q. You knew then that the work had not been satisfactory? A. Well, that is what he said, and I ran out of money and they finished it."

Defendant says its demurrer to the evidence at the close of the whole case should have been sustained. We think defendant is correct in this contention upon the showing herein made. If plaintiffs were to be paid $40 per acre for the whole acreage included in the area described, there would have been no reason for provisions for engineers' estimates and measurements of areas cleared, as the basis for final settlement. The price could have been determined and stated in one sum in the contract. The contract must be construed as a whole, giving effect to every part, if that is fairly and reasonably possible. So considered, it is not ambiguous. The contract was for clearing and only part of the land required clearing. The description of the land in the advertisement stated: "Containing approximately 90 acres clearing." This was less than one-fourth of the total area and clearly shows that transaction from its inception contemplated payment only for actual acres cleared and not by total area. Plaintiffs, after learning by field inspection that there were large cleared and cultivated fields on these farms, signed a contract for clearing the land described in the advertisement, which was the description adopted by the contract. There was even a provision, here, for percentages to be allowed for different kinds of clearing work. The same kind of a contract for similar timber clearing was construed in Lefler Bros. v. Lane & Co. (N. C.), 83 S. E. 463, to mean that "plaintiffs were not to be paid, in any event, for the entire amount covered by the boundary worked over, but only for such portions as were cleared by them." There can be no other reasonable construction of this contract.

The actual number of acres cleared by plaintiffs as determined by the measurements of defendant's engineers was somewhat in excess of fifty per cent greater than the original estimate in the

advertisement. Perhaps this allowed for the amount of drift on the land. At any rate. plaintiffs accepted the final estimate and payment thereunder in May, 1930, showing a total of 155 acres clearing and do not even claim to have objected to it (they said they did complain about some of the preliminary estimates), until after the government engineers rejected their work. While the contract does not provide that these estimates were to be conclusive, they must be considered prima facie correct, since plaintiffs accepted all payments on the basis of what they showed and do not even now attempt to impeach them for fraud or mistake. Plaintiffs must have known when they accepted the final estimate and payment, that they were not being paid on the basis of the acreage of the whole tract, since 155 acres was much less than half of the total area where they had worked. ■ When a contract provides, as this one does, for measurements and estimates by engineers as a basis for settlement, and payment is made thereunder upon a final estimate, there must be some evidence of mistake, bad faith or fraud before the determination of the matter by such engineers can be disregarded. [Williams v. C., S. F. & C. Ry. Co., 112 Mo. 463, 20 S. W. 631; Chapman v. K. C., C. & S. Ry. Co., 114 Mo. 542, 21 S. W. 858; McGregor v. Ware Construction Co., 188 Mo. 611. 87 S. W. 981; Southern R. E. & F. Co. v. Bankers Surety Co., 276 Mo. 183, 1. c. 196, 207 S. W. 506; Mackler v. M., R. & B. T. Ry. Co,, 62 Mo. App. 677; 9 C. J. 826-828, secs. 165, 166; 6 R. C. L. 962, sec. 340; 54 A. L. R. 1255 note.] Plaintiffs produced no evidence to show that the measurements of the land actually cleared by them, as shown by all the estimates and settlements, were wrong, nor to show what number of acres in the area were not in cleared and cultivated fields. None of their witnesses even attempted to make an estimate of the actual number of acres cleared. Plaintiffs were permitted to proceed upon the erroneous theory that they were entitled to $40 per acre for all the land included in the whole area whether it was in timber, pasture, meadow or cornfields, and only showed the acreage of the entire tract. There was, therefore, no evidence introduced tending to prove that plaintiffs were entitled, under the contract sued on, to any more than they had received and the judgment based on the right to recover for the total acreage in the whole area cannot stand.

■ Moreover, plaintiffs' own evidence disclosed that they failed to comply with their contract. One of the provisions of their contract was that they should do the work so that it met the requirements of defendant's Federal license as determined by the United States' engineers. This was a very material provision and to enforce it, the contract provided for withholding fifteen per cent of the amount determined to be due the plaintiffs, until this approval was obtained. Plaintiffs' work was rejected because it did not comply with the government requirements. There is no claim of mistake, bad faith or fraud on the part of the government engineers. When a contract

provides for acceptance of work, as complying with certain specifications, by engineers designated therein, before payment is due, the contractor cannot recover, on the contract, the whole amount to be paid for work required to be done by the contract without obtaining such approval, unless the provision requiring it be waived or he is prevented from obtaining it by fraud or some cause over which he has no control. [6 R. C. L. 956-961, secs. 335-338; 9 C. J. 755-758; 54 A. L. R. 1255 note; State ex rel. Dolman v. Dickey, 280 Mo. 536, 1. c. 550, 219 S. W. 363; McGregor v. Ware Const. Co., 188 Mo. 611, 87 S. W. 981; Chapman v. K. C., C. & S. Ry. Co., 114 Mo. 542, 21 S. W. 858; Williams v. C., S. F. & C. Ry. Co., 112 Mo. 463, 20 S. W. 631; Dinsmore v. Livingston Co., 60 Mo. 241; Hunt v. Owen Bldg. & Inv. Co. (Mo. App.), 219 S. W. 138; for a case of arbitrary and unreasonable action see Howard County v. Pesha (Neb.), 172 N. W. 55.] Plaintiffs' real position here is that this provision might be ignored. Plaintiffs obtained a submission of the question of whether they had complied with all the provisions of their contract entirely disregarding the fact that they did not show compliance with this one, but rather the contrary. They also obtained a submission of the question of whether they had made a new contract by which this provision was waived and defendant agreed to do what was necessary to meet the government requirements, of which there was no evidence whatever. Instead, the evidence shows that plaintiffs refused to go further with the work to meet the government requirements unless they were paid an additional amount to do so. They gave no excuse for nonperformance except that they had run out of money. The contract gave defendant the right, in such event, to complete the work and take the cost out of the fifteen per cent balance due plaintiffs which, under the contract, it had the right to retain for this very purpose. It is clear that this is what defendant did. It is a rather naive argument to say that the fact that approval of the government engineers was finally thus secured by defendant, after plaintiffs' refusal to do anything more without extra pay, could in any way help plaintiffs to make a case against defendant. The contract was that plaintiffs were to do the work so that it would meet the government requirements and to recover the whole amount due under this contract they had to show that *they did it.* By failing to do so and by failing to impeach the accuracy of the final estimate, plaintiffs failed to show that they were entitled to recover any additional amount under the contract. It may be, however, that if the case is retried upon correct principles of law, plaintiffs might be able to show that they have not been fully paid for all the work they did.

The judgment is reversed and the cause remanded. *Ferguson* and *Sturgis, CC.,* concur.

PER CURIAM:—The foregoing opinion by HYDE, C., is adopted as the opinion of the court. All the judges concur.