Dr. F. F. Patzman v. William J. Howey, Appellant.—100 S. W. (2d) 851.

Division One, December 14, 1936.

12

*Henry S. Conrad, L. E. Durham* and *Hale Houts* for appellant.

14

,·W. H. L. Watts, C. W. Prince, James N. Beery and Denton Dunn for respondent.

HYDE, C.—This case, coming recently to the writer, is an action to recover the amount paid by plaintiff upon a contract to purchase Florida land. Plaintiff alleged that this contract was induced by fraud and misrepresentation. Plaintiff originally made the W. J. Howey Land Company and the W. J. Howey Company, corporations, defendants, but dismissed as to these corporate defendants and proceeded only against defendant Howey individually. Plaintiff had a jury verdict for $10,226.35, and defendant has appealed from the judgment entered on this verdict.

Plaintiff's petition alleged fraudulent misrepresentations, as follows:

"That to induce plaintiff to purchase said land, the defendants represented to plaintiff that said land was owned by the W. J. Howey Land Company and would produce enormous crops of Natal hay and

citrus fruits; that said land was fertile and adapted to continuous cultivation in its then condition; that defendants would open up and establish rock highways to and by said land, and that defendant, W. J. Howey Land Company, had good title to said land, or was in position to then deliver fee simple title to said land to plaintiff.''

Defendant contends that his demurrer to the evidence at the close of the case should have been sustained and this requires a statement of the facts from the view of the testimony most favorable to plaintiff.

Plaintiff, a dentist in Kansas City, was, in December, 1915, interested in Florida land owned by the W. J. Howey Land Company by its Kansas City agents Johnson, Major and Tutt. Plaintiff testified:

''I was invited over to Howey's offices where Dr. Major and Mr. Tutt showed some pictures of Florida and what they intended to do and were doing in Lake County, Florida, and what they had done in some other parts of Florida and told about the wonderful development there, and that Howey owned thousands of acres of land in Lake County, Florida, and that they were developing this for Natal hay and citrus fruits, and that they were anxious for me to go down there and select a piece of land right near the townsite of Howey, which would double in value or more in a few years' time, and that they were going to build a railroad in there within the—within that year and some rock roads, and there is a rock road called the Dixie Highway, was to extend right by the eighty acres of land that they showed me, and that if I would purchase this ground and pay them a quarter down, which was $1,500.00, they would give me a contract for this Natal grass or Natal hay, that two-thirds of the crop would make the other quarter payment so that all I would have to pay down would be $1,500.00 and then pay them for seed and caring for this Natal hay, so I went down there.''

Plaintiff was furnished with literature describing the land company's project. There were statements in it to the effect that the land was owned by the W. J. Howey Land Company, and plaintiff positively testified that the agents represented to him that this company ''owned the land.'' The literature stated that ''Negotiations are now pending'' for railroad extensions through the land; and also stated: ''Hard-surfaced roads now under .construction by the Commissioners of Lake County, and those to be built by the Company as connecting links, will provide the entire tract of 80,000 acres with splendid highways.'' The literature further stated: ''The development of this famous ridge land of Lake County is to be the closing work in Florida of the Howey Land Company. When this became known the business associates of Mr. W. J. Howey, the active head and general manager of the Company, petitioned that the town now being built to serve this project be named Howey.'' There was also

literature with the following caption: "A conservative estimate of what can be accomplished at the end of a period of four years' development of 40 acres planted to Natal hay, on the Howey Lands in Lake Co., Florida." This was followed by computations of annual income and expense which showed that land purchased at $75 per acre and cleared and planted in Natal hay at $30 per acre would (if it produced three tons per acre which sold at $20 per ton and cost $5 per ton to cut, bale and market) during a period of four years, accomplish the following: "Results—Total amount of cash invested $1950; forty acres of land fully paid for and planted to Natal hay, and at the end of four years we have $4680, cash on hand, and an annual net income of $1800, or a monthly income of $150." If this could be accomplished it was only necessary to pay for seeding and hire some one to market the hay; then the land would pay for itself and pension the owner besides.

The land company agent Johnson testified concerning the literature showing how the land could be paid for in hay, as follows:

"Q. Where did you get those papers? A. From the Chicago office of the W. J. Howey Land Company. . . . Q. Did you ever talk to Mr. Howey about them? A. Yes, sir. . . . Mr. Howey called our attention to the raising of Natal hay on the land in Lake County, Florida, and furnished us with these circulars to show what could be done with Natal hay, that it was a profitable crop that that land would produce. Q. What were those figures based upon? . . . If you were told by Mr. Howey . . . A. That they were based upon the experience of thousands who had raised Natal hay in that part of Florida."

Plaintiff went with his family to visit his wife's relatives who lived near Kissimmee, Florida, about seventy miles south of where the land company was locating its town of Howey. By previous arrangement, Johnson, accompanied by a local man named Bryson, came to Kissimmee in an automobile and drove plaintiff and his wife to the Howey townsite where they stayed two nights in a tent. Plaintiff said:

"They took us on to Leesburg, I think on the other side of the lake, and showed us some developments of the country, some one or two Natal hay fields and some fruit groves. . . . Then the next day we went out over this tract of land of Howey's. . . . They took us out over this land and showed me 160 acres and wanted me to purchase that. . . . We drove over the ground and walked over some of it, and there was a lot of brush and timber and such as that on it, and then they showed me some cleared right near there, and they said 'that is the way they could clear this up,' so we went back to Howey or to the tents there where the townsite of Howey was to be, and I signed an option to purchase 160 acres or any part of it that I wanted."

Johnson drove plaintiff back to Kissimmee again, and when he returned to Kansas City he executed a contract dated December 28, 1915, for the purchase of eighty acres for $6000. For this purchase price, plaintiff paid $1500 in cash and executed three $1500 notes due in one, two, and three years. Plaintiff paid over $1000 on the note due in one year. He also paid out $2753.36 to Bryson for clearing the land and seeding it in Natal grass during the year 1916, but the hay crop from the Natal grass only produced about seven tons that year. Plaintiff said that he paid Bryson to have the hay cut, baled and delivered to market but "they baled it up in the field and let it rot; they never delivered it anywhere." In February, 1917, plaintiff went to Florida with his two brothers, who were given some work by the land company and thereafter during that year bought from the land company a 10-acre tract about two miles from plaintiff's land. Plaintiff said he learned that there was a drought in 1916 but "it was the same thing every year after that;" that he "never heard it was any different any year;" and that his wife's relatives told him "it had been the same with them every year." He said the country around Howey looked pretty much the same to him as that near Kissimmee, but that "Johnson and Bryson told me it was much better up there at Howey and the soil was much richer." Plaintiff said that his purpose in going back in 1917 was to see how things looked before he put any more money into it. He made most of his payments on the one-year note after he returned from that trip. He said that he knew that no railroad had been constructed but was still looking for it and that he also knew that the highway to his land had not been constructed. He said that he had also heard that the war had thwarted the plans of the railroads and State authorities. Evidently, there was another drought in 1917.

Plaintiff had a witness who owned land in Florida, about eighty miles from Howey, who said that his land was practically the same as the Howey land; that it was "high pine land" with the same kind of soil; and that it required fertilizer to produce crops. However, the only time he had ever been at Howey was in 1913 or 1914, when it was a wild undeveloped country. He further stated that Natal grass was imported from South Africa; that "it grows just like weeds all over the country;" and "it is hard to get rid of it;" and that he did not "know of anybody feeding it to stock."

Defendant's first direct contention with plaintiff's transaction appears to have been by letter of June 5, 1916, notifying plaintiff of the organization of an hay exchange at Howey, Florida, of which Bryson was to be the manager, and offering him membership at the price of $1 per acre. This letter also notified him that a bond election had been called by a road district in Lake County for the purpose of voting bonds to hard surface twenty miles of road passing through the town of Howey. Plaintiff said that he joined the exchange. In

December, 1916, plaintiff wrote defendant complaining about the price charged by Bryson for cutting and baling his hay. Defendant wrote back that this price was more than the estimate because drought had caused such a small yield, but stated that the country had not had a drought for twenty years, and that it was not likely to have another soon. During that same month, plaintiff sent defendant a check for $270 for one year's interest on his notes. Defendant also wrote plaintiff in June, 1917, acknowledging receipt of another remittance to him. It appears from these letters that defendant complained that plaintiff's brothers were telling people that "there is nothing to Natal hay." In December, 1917, defendant wrote plaintiff that "we, ourselves, came out in Natal hay in a very satisfactory manner this year, as well as some of the other parties who took care of the property. . . . I would advise in February that you plant it all to melons. . . . Under normal conditions 80 acres of melons would pay you in the neighborhood of $5000, and then in the spring the sod could be turned back and with the present stand of Natal hay that you now have, under normal conditions of next summer you should receive several good cuttings of Natal hay."

After further correspondence about payments due from plaintiff, on February 19, 1918, defendant wrote him a proposition to accept $3200 for $3726 which was then due, saying:

"I am called upon to raise $40,000.00 within the course of the next week or two, and in order to do this I want to submit a proposition on the balance of your land. . . . This will give you considerable discount and help us out. I am writing you this personal and confidential letter because I do not want anything to happen whereby your interest will become involved. . . . Should I fail to raise required money I do not know just what might happen; in that case you would have to pay your notes for the full amount and might jeopardize your interest."

In July, 1918, after defendant had made other efforts to collect the notes, plaintiff wrote defendant, saying: "You have not done a thing to which you had agreed. . . . I bought this land with the understanding that the improvements were going to make it worth the money I paid for it. As it is I have already paid you four times what it is worth." Plaintiff was then notified by the land company that his contract was canceled, under its provision that in case of default plaintiff's unpaid notes could be returned to him and the amounts paid by him kept by the land company as liquidated damages. Plaintiff then wrote to defendant: "I am informed that the land you sold me has never been transferred to the Howey Land Company, and the reason you gave me notice that you were going to terminate my contract is that you can not deliver a title." Thereafter, although he did not mention plaintiff's letter about the title, defendant wrote plaintiff offering to reinstate the land company con-

tract and advising him that it would be profitable to raise cowpeas, velvet beans, peanuts and feed them to swine. In this letter defendant said: "The land which you purchased from us in Lake County is regarded as the very finest peanut land that can be had." In 1919 defendant again wrote plaintiff a letter commencing as follows: "I am writing to inquire if you would be interested in repurchasing the 80 acres sold you by the Howey Land Company in Lake County, December 28, 1915. . . . I do this because I do not want to be criticised or blamed for having taken any advantage of you whatever." All of these letters written by defendant were signed "W. J. Howey." Some were written on the land company's stationery and some on other stationery. During this period, letters from anyone else connected with the land company were signed "W. J. Howey Land Company, by (name of the writer)."

It was shown that defendant had contracted to buy the land, which was sold to plaintiff, as a part of a larger tract sold to him by the Whitmer Land Company in March, 1915; and that he had assigned this contract to the W. J. Howey Land Company. This contract stated that the Whitmer Company *claims title* to approximately twenty-two thousand acres of land" divided into two classifications, as follows: "Lands, ready to be delivered," and "Lands, titles to which are to be perfected." The Whitmer Company agreed "to convey" such lands as were listed in the first class, but, as to the lands in the latter class, it only agreed to convey "so much" as it might "be able to perfect its title." This contract further provided that the Whitmer Land Company agreed "at its own proper cost and expense, to do all things that it reasonably can, that may be requisite and necessary to perfect the title to the lands, . . . by bringing suit to quiet title under adverse possession, acquiring quit claim deeds from adverse claimants, and otherwise," but that it reserved "the right to perfect said titles so far as it reasonably can; . . . provided that (it) shall be the judge of what it reasonably can do to perfect said titles; and also provided that any and all lands, the title to which cannot be perfected as aforesaid by (it) shall be excepted and eliminated from this contract." The land sold to plaintiff was listed with the tracts which required title to be perfected. Defendant, by this contract, agreed to pay the Whitmer Company $10 per acre for the whole tract, as follows: $20,000 during the first year, and $30,000 per year during each of the next three years, and the balance during the fifth year. This contract also provided that the Whitmer Land Company would deliver deeds to purchasers for tracts of forty acres or multiples thereof upon payment to it of $15 per acre therefor. This contract further provided that it could be canceled if defendant made default, but stated that defendant expected to resell the lands to other purchasers, and contained provisions for protection of such purchaser from him, provided pay-

ments made by them were deposited with and apportioned by a trustee agreed upon until the Whitmer Company received $15 per acre, which defendant agreed to do upon each sale made by him. For a further description of the contract see Stoltzfus v. Howey (Mo. App.), 54 S. W. (2d) 501.

Defendant, testifying by deposition without cross-examination, denied that he had anything to do with the sale to plaintiff or that he had any personal interest in it. Defendant's Florida attorney, testifying likewise by deposition, stated that in 1918 the Howey Land Company could have acquired title to the land sold to plaintiff "upon payment of the remaining purchase price for that tract of land," and "could have delivered or caused to be delivered a marketable title" thereto.

■ Defendant contends that "plaintiff failed to make a case, first, because the record discloses no participation nor responsibility upon the part of the defendant Howey in any of the representations relied upon by plaintiff as a basis for recovery; and, in the second place, under the pleadings and the evidence there was presented no actionable misrepresentation upon the part of anybody."

The first contention must be sustained as to all actionable representations alleged to have been made before plaintiff executed his contract of purchase. It is not claimed that defendant made any of these representations to plaintiff, and nothing in the record shows that defendant participated in any way in any representations as to existing facts, claimed to have been made by the land company's Kansas City agents to plaintiff, or that he knew they would be made. Defendant's interest in the corporation was not shown and it is not definite whether he was an officer or only an employee. Certainly, defendant personally would not be liable for representations made by the corporation's agents, even if he was an officer of the corporation, unless he in some way induced them to be made or consented to them being made. An officer of a corporation is not liable for the tort of an agent of the corporation, even though the corporation might be, unless he had some participation in it. [Ray County Savings Bank v. Hutton, 224 Mo. 42, 123 S. W. 47; Wolfersberger v. Miller, 327 Mo. 1150, 39 S. W. (2d) 758; 14A C. J. 176, sec. 1955; 7 R. C. L., secs. 486, 489.] This case was tried and submitted as though it was a suit against the land company rather than a suit against defendant individually. Therefore, the judgment cannot stand.

■ As to the second contention, the submitted representation ("that the soil thereof was capable of producing crops of Natal hay *that would yield a profit to plaintiff*") was not actionable upon any theory, but the representations as to title are an entirely different matter. Even representations as to present purpose or value or quality or as to fertility of the soil might be representations as to exist-

ing facts. [Finke v. Boyer, 331 Mo. 1242, 56 S. W. (2d) 372; Collins v. Lindsay (Mo.), 25 S. W. (2d) 84; Metropolitan Paving Company v. Brown-Crummer Investment Company, 309 Mo. 638, 274 S. W. 815; Stonemets v. Head, 248 Mo. 243, 154 S. W. 108.] But these cases require one who makes his own investigation to be guided to some extent by what he can reasonably see or learn concerning such matters, and there is no evidence that defendant made or authorized any such representations to induce the sale. There is evidence to connect defendant with the hay profit representations, but it would be difficult to conceive of a more speculative and promissory prophesy than one to the effect that a person would be able to carry on any enterprise, without even giving it personal attention, so that it "*would yield a profit*" to him throughout future years. Surely even the famous fountain of youth, which the Spaniard, Ponce de Leon, was told he could find in Florida, was equaled, if not outclassed, by Howey's hay.

However, a representation that one has title or is in a position to deliver title in fee is clearly a representation of an existing fact. [Stoltzfus v. Howey (Mo. App.), 54 S. W. (2d) 501, and authorities cited.] While defendant did not make any such representation to plaintiff before he contracted to purchase, he did know the state of the title, and what was required to protect plaintiff so that he would get the title he was paying to get. Defendant knew this because he personally made the contract with the Whitmer Company, and he personally was obligated by that contract to make the payments and do the other things required to deliver a good title to purchasers. He could not escape these obligations by assigning this contract to a corporation. Neither could he escape liability to purchasers, whose contracts to purchase these lands from the corporation he participated either in obtaining or completing, if he failed to comply or obtain compliance with the requirements of his contract necessary for their protection. "When an officer or agent of a corporation by fraud procures the money of a third person while acting for the corporation, he cannot escape liability therefor by paying over the money to the corporation." [7 R. C. L. 507, sec. 489; Bank of Atchison Co. v. Byers, 139 Mo. 627, 41 S. W. 325; Hoffman v. Toft (Ore.), 142 Pac. 365, 52 L. R. A. (N. S.) 944, Ann. Cas. 1912D, 721, note.]

It was shown by defendant's contract itself that the title to the land sold to plaintiff had to be perfected before the Whitmer Company could convey a good title to it, and that it was not bound to perfect it, but could eliminate it from the contract and refuse to convey it, if it saw fit to do so, if only because of expense or inconvenience in perfecting the title. Defendant would be liable for what plaintiff paid if he collected money from him, knowing that the land company would never deliver good title to this land. The

fact that the parties contracted that this title was defective was enough to show that there was something wrong with it and, considering the terms of the contract, was sufficient to warrant a finding by the jury that the land company sold plaintiff land without any reasonable certainty of being in a position to deliver good title. Certainly, there is nothing to show the nature of the original defects in the title to this land, or that they were made good by the Whitmer Company. ■ Plaintiff contracted for and was entitled to have a title which was not doubtful and did not suggest the possibility of a lawsuit but which a well-informed and prudent man paying full value would be willing to take. [Smith v. Riordan (Mo.), 213 S. W. 61; Munyon v. Hartman, 262 Mo. 449, 171 S. W. 61; Williams v. Ellis (Mo. App.), 239 S. W. 157, and cases cited; see, also, 57 A. L. R. 1253, note.] However, it was not shown that, to induce this sale, defendant made any representation about this condition of the title at all (and plaintiff's instruction did not require such a finding), so that recovery against defendant must be on the theory that he collected from plaintiff knowing that he could not get what he bought.

There was something else that defendant did know about the title to every tract. He knew that the Whitmer contract provided two ways by which purchasers could be protected, namely:

First: By paying $15 per acre to the Whitmer Company, a deed could be obtained to any tract of forty acres or multiple thereof. It took only $1200 to get a conveyance for the eighty acres sold to plaintiff and his down payment was $1500, so that method was possible at the outset.

Second: By depositing with an agreed trustee all payments of any purchaser, in excess of "ten per cent of the amount of the sale" which the seller was allowed to retain, then even if defendant or the land company failed to make the contract payments, the Whitmer Company, if this was done, was bound by the contract to "convey . . . lands previously sold by him by a written contract of sale . . . in the same manner and under the same conditions as if no default had been made." Under this provision, the trustee was authorized to pay sixty per cent of the deposits to Howey and the Whitmer Company had to convey to his purchasers whether they got all of their money or not.

Regardless of whether plaintiff was induced by fraud to make the contract of purchase, it was fraudulent to take his money and keep on collecting from him without doing what was required to give him what he was paying for. That would be the same thing as taking his money knowing he would get nothing for it, and defendant would not be excused even if he thought that the land company would ultimately be able to make all the payments required by the Whitmer contract. [See Lynch v. Southern Mining Land & Lumber Co., 135 Mo. App. 672, 117 S. W. 624.] Defendant had no right to play fast

and loose in this transaction by recklessly, in the hope that everything would finally balance out, applying the money, paid by plaintiff, for other purposes than to make the deposits which would insure plaintiff a deed. Defendant did not attempt to show that these deposits were made, but nevertheless, to make a case, plaintiff was required to produce some substantial evidence to show that they were not made. We think that there is such evidence in the record.

Plaintiff's first payment was acknowledged by the land company only, but the first year's interest was sent directly to defendant in December, 1916, and acknowledged by his letter. Another payment of $404.50 was made in May, 1917, to defendant and receipt acknowledged by his letter. This and other payments made prior thereto, aggregating $1034 on the principal of his second $1500 purchase installment, was also acknowledged by a letter from the land company. No more payments were made by plaintiff, but several other letters were written to him by defendant urging him to send more money. We think that the fact that defendant, who was himself liable to pay the Whitmer Company for the land, collected these payments on plaintiff's contract with his land company, together with the admission made by his letter of February 19, 1918, to plaintiff, was sufficient to warrant the jury in finding that plaintiff's payments were not deposited as required by the Whitmer contract, and that defendant was guilty of a fraud upon plaintiff in participating in the collection of money from him without making application of it in the way that he knew to be necessary before plaintiff could get anything for it. That letter said: *"I am called upon* to raise $40,000.00. . . . This (discount offered plaintiff to pay the balance on his contract) will . . . help us out. . . . I do not want anything to happen whereby *your interest will become involved* . . . should I fail . . . you would have to pay your notes for the full amount and *might jeopardize your interest."* If defendant had seen that his contract was faithfully complied with by proper deposit of plaintiff's money with a trustee, plaintiff's interest could not have *become involved* because no default could then jeopardize his interest. Plaintiff was not required to complete his contract if defendant and the land company did not do what was necessary to get the title sold to him. We hold that a jury could reasonably place such a construction upon these statements.

▇▇ Plaintiff's petition alleged that he "paid defendant W. J. Howey, pursuant to said contract" $3600 principal and interest; that he learned about July 6, 1918, that title to the land could not be delivered; that he then demanded to know if title could be delivered before he would make further payments; and that defendants had wrongfully converted to their own use the amounts he had paid to defendant W. J. Howey. We think that plaintiff's petition.

and evidence, after eliminating alleged representations of other agents to induce the purchase, discloses a reasonable possibility and substantial evidence to make out a cause of action for recovery of what he paid on the theory above discussed. This court, therefore, has discretion to remand the cause to permit the petition to be amended and for a retrial of the case upon the cause of action disclosed and on correct principles of law. [Mann v. Bank of Greenfield, 323 Mo. 1000, 20 S. W. (2d) 502; Williams v. Walker, 333 Mo. 322, 62 S. W. (2d) 840; Myers v. Union Electric Light & Power Co., 334 Mo. 622, 66 S. W. (2d) 565; Byrne v. Prudential Ins. Co. (Mo. App.), 88 S. W. (2d) 344.] Because of the view we take it is not necessary to discuss the other contentions made by defendant.

The judgment is reversed and the cause remanded. *Ferguson* and *Bradley, CC.*, concur.

PER CURIAM:—The foregoing opinion by HYDE, C., is adopted as the opinion of the court. All the judges concur except *Collet, J.*, not sitting.