## TAYLOR v. MOORE et al.

No. 5522.   Decided October 25, 1935.   (51 P. [2d] 222.)

Petition for Rehearing Denied February 8, 1936.

*Robinson & Robinson* and *A. B. Morgan,* all of Provo, for appellant.

*Willard Hanson* and *A. H. Hougaard,* both of Salt Lake City, for respondents.

FOLLAND, Justice.

Plaintiff T. T. Taylor brought suit to foreclose a mortgage on certain ranch property in Juab county. By counterclaim defendants Wm. Moore and wife sought to rescind the notes and mortgage on grounds of fraud, and to recover the amount of money paid and the value of property conveyed by them as consideration for the purchase of the ranch property. They offered to return what they had received by way of property, rents, and profits. The trial court found for the defendants, entered a decree rescinding the notes and mortgage, entered judgment against plaintiff and the interpleaded defendant Nephi M. Taylor for $17,342.12, quieted title in the Taylors

to the ranch property with the exception of certain described railroad rights of way, with a lien thereon in favor of defendants Moore, and ordered the property sold in satisfaction of the judgment. T. T. Taylor and interpleaded defendant Nephi M. Taylor appeal and assign numerous errors grouped and argued under twenty different heads.

The facts may be briefly stated as follows: Except where otherwise indicated, the fact stated is not disputed. In 1919 T. T. Taylor and Nephi M. Taylor were the owners of a ranch of approximately 1,978 acres of meadow and grazing land in Juab county. The main line tracks of the Los Angeles & Salt Lake Railroad Company, Provo branch, run through the property. The railway station of Juab is on railroad lands within the external boundaries of the ranch. At this point the railroad company maintains a Y, and is the owner of 13¼ acres of land on which the Y is located. Some of the ranch buildings are on this 13¼-acre tract. The ranch-house is an old railroad hotel located on the railroad right of way between two lines of railroad tracks. The barn or garage, machine shop, chicken coop, and part of the corral are on the 13¼-acre tract of the railroad land, while other ranch buildings and part of the scales are on ranch land. The scales and chicken coop were constructed after the Taylors parted with possession. All the buildings belong to the owners of the ranch, and the older buildings have been for upwards of 35 years allowed to remain on railroad land without objection. In July of 1928 the railroad company served written notice on the defendant Wm. Moore to remove the old hotel building from the railroad right of way. The railroad company maintains on its right of way a water tank supplied with water piped from a spring some distance away. The overflow from the tank runs off onto meadow lands and for many years has been used by the occupants of the ranch without objection. The water was so used at the time of trial. The old hotel building is supplied with water piped from the railroad tank. It has one tap inside the house and one outside. So far as disclosed by the record,

the railroad company has never made any objection to or interfered with the use of this water.

In 1919, T. T. Taylor and Nephi M. Taylor sold and conveyed the ranch property, together with cattle, other farm animals, and implements on the place, to John K. Allen for a consideration of $50,000. Allen paid the Taylors $5,000 in cash and conveyed to them a farm in Utah county of the agreed value of $7,000 which was credited on the sale price. Allen and wife executed notes and mortgage to the Taylors for the balance of $38,000. The deed and mortgage were not then recorded, but held in the office of the Dixon Real Estate Company at Provo. Allen went into possession of the place in 1919. In 1922, Thomas Allen, a son of John K. Allen made arrangements with his father and the Taylors by which he took over the ranch and assumed the unpaid bal- of the purchase price. The Taylors executed a deed to Thomas Allen dated August 23, 1919, and recorded November 27, 1933. Thomas Allen and wife executed to the Taylors a mortgage for $37,833, that being the balance of the purchase price then unpaid. This document was recorded November 7, 1922. In the spring of 1923, the defendant Wm. Moore called at the ranch and became interested in its purchase. He was not a stranger to the property, having visited it once or twice before. The parties divide with regard to the substance of the conversation between Moore and the Taylors respecting the sale of the ranch to Moore. The Taylors' version is that Moore came to the seed store of the Taylors at Provo, and that the first time he called both Taylors were present. He called a second time when only T. T. Taylor was present. He told them on the first visit he had arranged with Allen to buy the place provided the Taylors would substitute him for Allen on the mortgage. Taylor said that would be alright, as the store was good for the mortgage. Moore testified that only T. T. Taylor was present at the store when he called and that he told Taylor Allen had said the Taylors owned the place and that he (Allen) would vacate possession if the Taylors would sell to

Moore; that T. T. Taylor said his brother Nephi M. Taylor owned the place and that it was for sale. As a result of negotiations between the parties, a warranty deed to the ranch was executed and delivered by Thomas Allen and wife to Wm. Moore, dated May 29, 1923. The deed recites it was given subject to a mortgage dated June 20, 1922. Wm. Moore and Rose Moore, his wife, gave a promissory note for $1,530 to Thomas Allen, said by one of the witnesses to be for his equity in the ranch, and also a note for $470, said to have been given for his interest in the livestock. Moore's testimony was that the $1,530 note was for his interest in the livestock and the $470 note for hay then on the place. The Moores went into possession about this time, and have remained in possession ever since. On June 1, 1923, the Moores executed a mortgage on the property to the Taylors for $36,-479 which was recorded October 11, 1924. Payments had been credited on the mortgage aggregating $3,691 up to and including February 14, 1925. At that time an acounting was had between the Moores and the Taylors, when Moore and wife conveyed certain ranch property in Summit county by deed to Nephi M. Taylor and received a credit on the mortgage indebtedness of $17,309.30. A new mortgage on the ranch was executed by the Moores to T. T. Taylor for $21,-400 to secure payment of notes in the same aggregate sum and payable in yearly installments to and including the year 1939. Interest payments were made at various times on these notes in the aggregate sum of $2,358 up to and including December 19, 1927. A bill of sale to Wm. Moore signed by Nephi M. Taylor, T. T. Taylor, and Thomas Allen was given conveying certain cattle, horses, pigs, and implements on the ranch, and was dated June 1, 1923. At the same time Moore gave the Taylors a chattel mortgage on the same personal property. This mortgage was released at the time of settlement between the parties in February, 1925. The real estate mortgage of February 19, 1925, is the subject of this suit of foreclosure. The suit was filed November 15, 1928.

It is the theory of the defendants Moore that the contract of purchase was made with T. T. Taylor and Nephi M. Taylor, notwithstanding the conveyance was made by warranty deed from Thomas Allen and wife, and that they are entitled to rescind the notes and mortgage given to T. T. Taylor, and to recover the amounts paid on the contract of purchase because of alleged false and fraudulent representations made to Wm. Moore by the Taylors before contract of purchase. The false and fraudulent representations are alleged to be that they, the Taylors, were the owners of the water piped to the house and flowing from the railroad water tank to the meadow, and that the house, barn, and other buildings were located on land owned by them. Moore asserts that he learned about July 1, 1928, that the buildings mentioned were on railroad land and later in October of 1930 that the water was owned by the railroad company and not the Taylors; that when he was advised in July of 1928 that the buildings were on railroad land he refused to make further payments and called the matter to the attention of the Taylors. There were some negotiations between the parties with respect to building a foundation on the ranch land and moving the old hotel to the foundation. A foundation was built by T. T. Taylor and Nephi M. Taylor, but the building was not removed. Moore failed to make further payments of interest or principal, and this suit to foreclose the mortgage was commenced.

It may be well to state at this time that the deed, while undoubtedly sufficient to convey any water rights appurtenant to the ranch, did not make specific mention of water or water rights, and that the descriptions in the deed do not include the 13¼ acres of land owned by the railroad company on which some of the farm buildings were located.

Thomas Allen and wife, grantors in the warranty deed to Wm. Moore, were not made parties to the suit. Nephi M. Taylor and the Los Angeles & Salt Lake Railroad Company were interpleaded as defendants. The interpleaded defendant Nephi M. Taylor by appropriate pleading denied the

alleged fraudulent representations. All parties to the suit signed a stipulation that the Los Angeles & Salt Lake Railroad Company was the owner of the land claimed by it and particularly described in the stipulation; the same being the tract of 13¼ acres heretofore mentioned and the right of way for its railroad and for a pipe line leading from its spring to the railroad tank heretofore mentioned. The stipulation recognizes that the railroad company is the owner of the water which it conveyed through the pipe line to its water tank, but that the defendants Moore claimed some right to the use of some of said water for culinary and irrigation purposes after it reached the railroad property through the pipe line, but that the stipulation would not affect or determine such claim, and that such claim "cannot be and shall not be litigated or adjudicated in this proceeding." It was stipulated the railroad company might be dismissed as a party. Notwithstanding the stipulation for dismissal, the decree quieted title in the railroad company to the lands described.

We think this is not a case for rescission of the contract. Too long a time had elapsed for the parties to be placed in status quo with any degree of equity to all concerned. The fraud, if any, was the making of false and fraudulent representations by Nephi M. Taylor to Wm. Moore in the spring of 1923. The defendants Moore were in possession of the ranch for more than five years before asserting the fraud and claiming the right to rescind. In the meantime the farm and ranch lands conveyed by Moore to Nephi M. Taylor had been sold and other changes in the condition of the parties had taken place.

This being an equity case, the parties are entitled to the judgment of this court on the record before us. To support a rescission of the contract or cancellation of the mortgage the evidence should be clear and convincing in character, and the preponderance of evidence support him who claims the right to rescind. The rule is

stated in *Ferrell* v. *Wiswell*, 45 Utah 202, 143 P. 582, 583, as follows:

"We have no right to overlook the wholesome rule that where deeds or contracts are sought to be vacated and set aside upon the ground of fraud and deceit, the burden of proving the alleged fraud is upon him who asserts it; moreover, that the fraud must be established by clear and convincing evidence."

See, also *Greco* v. *Grako*, 85 U. 241, 39 P. (2d) 318; 66 C. J. 644.

The deed from Allen and wife to Moore and wife, the bill of sale, and the mortgages would indicate that the sale of the premises was made by Allen to Moore. The Taylors had actually been out of possession more than five years at the time Moore came onto the scene. To sustain the position taken by the defendants Moore, it was necessary for the court to find that notwithstanding the written records the sale transaction was actually made and consummated between the Taylors, as owners, and Moore, as purchaser. It may be seriously questioned whether this finding is supported by a preponderance of the evidence or that the fraud on which Moore relied is supported by a preponderance of the evidence. Mr. Moore is the only witness who testified that false representations were made or that the sale contract was made with the Taylors as owners. The fraud is based on what Moore testified Nephi M. Taylor told him while at the ranch prior to his entering into the contract of purchase. At that time there were at the ranch Wm. Moore, Nephi M. Taylor, J. Elmer Jacobsen, and Thomas Allen. The alleged conversation in which the alleged false representations were made was heard and testified to by Wm. Moore only. In this he is flatly contradicted by the testimony of Nephi M. Taylor, and in other particulars by J. Elmer Jacobsen and by T. T. Taylor. T. T. Taylor had no conversation at the ranch with Moore, but had conversations with him on at least two occasions, and probably three, at Taylor's seed store in Provo. Moore is contradicted by T. T. Taylor with respect to the conversations at that place. Jacobsen is a real estate broker

in Provo connected with the Dixon Real Estate Company. He or his company acted at times for each of the parties, and, so far as disclosed by the record, was a disinterested witness. If Moore's reliability as a witness is to be tested by his own statements, these do not lead one to the conclusion that he should be believed above the other parties or witnesses. He testified he had been entirely ignorant of the fact that the old hotel and other buildings were on railroad property until he received written notice from the railroad company in July, 1928, to remove the hotel building from the right of way. A civil engineer named C. S. Duncan, a wholly disinterested and unimpeached witness, testified he called on Mr. Moore at the ranch in March of 1926 and told him the hotel building was on land owned by the railroad company, that the company desired to raise its tracks, and in order to do so the house should be removed. They discussed the question of removal and location. One site selected was on railroad land. Duncan testified he told Moore the company might give him a lease to the land, but would not give a deed. He also definitely testified that he told Moore at that time that other of the ranch buildings were on the railroad tract of land. Moore admitted he was told by Nephi M. Taylor that the railroad owned "about 13 acres" in that immediate vicinity, but said he was assured by Taylor that the buildings were on land owned by the Taylors. An inspection of the map would indicate that Moore might have been misled into believing that some of these buildings were not on railroad land, especially when so told, if he was, by Nephi M. Taylor. It is difficult to understand how he possibly could be misled with respect to the old hotel building which was located on the right of way between the tracks on the main line of the Provo branch. Moore testified the water from the water tank was sufficient to and did irrigate 125 acres of land. Taylor's witnesses testified it would only irrigate from 1 to 4 acres of land. The railroad engineer made accurate measurements of the water flowing through the pipe line to the water tank and found 67 gallons per min-

ute or 9 cubic feet per minute. The railroad company used from 10 per cent to $33\frac{1}{3}$ per cent of this water for its own purposes. The remainder is all that was available for use on the ranch for all purposes. The amount of water actually available for use would indicate that Mr. Moore's testimony was less accurate than that of the other witnesses. This was not the only water on the ranch. There was a flowing well, one or more springs, and the meadow lands were subirrigated.

To justify the rescission, the party seeking to avail himself of that remedy must move promptly and with all reasonable diligence to disaffirm the contract upon discovery of the fraud. If we assume fraud is proved and that the physical facts were insufficient to put Moore on notice that the Taylors were pretending to convey more than ██ they owned, and that he was misled to his injury, yet, by a clear preponderance of the evidence Moore learned of the misrepresentations in March of 1926 when Mr. Duncan, the railroad engineer, told him the hotel and other ranch buildings were on railroad land. Moore, however, did nothing about the matter until after the written notice was served on him in July of 1928. In the meantime he had made payments of interest on his indebtedness, had enjoyed the use and benefits of the ranch, and had exercised all of the rights and prerogatives of ownership. After receiving the written notification, however, he took the notice to the real estate office of Mr. Jacobsen, who thereupon called the Taylors in, and Moore told them, "I won't make any more payments until this is straightened up." Later one of the Taylors came to the ranch and told Moore that they would move the house and fix everything up. Moore said, "Well, I says, if you are willing to do that, I says, if you will make the right adjustments, I guess it will be all right." Following this conversation the Taylors built a foundation on the ranch land on which to move the house. For some reason the house was never moved. The parties disagree as to the conversations respecting the matter. Moore's version is no

more reasonable than that of the Taylors. Moore's testimony in effect was that the Taylors recognized an obligation to place the house on ranch land, and started to do so by building a foundation, but before removal abandoned the project. T. T. Taylor testified that Moore said, "I am not going to make any more payments on the project, unless you fellows will help me out about moving the buildings;" that Taylor talked with the railroad officials and then told Moore that the railroad company had agreed to move the building from where it stood to a place on the ranch property provided a foundation was made for it. Moore said that was satisfactory, and Taylor built the foundation, but after it was built Moore said he would not go through with his payments even if the building were moved, and that he had paid too much for the ranch. Thereupon Taylor abandoned the removal project and brought suit to foreclose the mortgage. Moore remained in possession of the ranch, and for aught that appears is still in possession. His counterclaim for rescission was filed January 7, 1929, nearly three years after he had been fully informed by the railroad engineer that certain of the ranch buildings were on railroad land. We think he is too late to rescind if it be assumed that fraud is proved, and must be left to his remedy at law for damages. It is said in 4 R. C. L. 514 as follows:

"The rule is that where a party has been induced to enter into a contract by false and fraudulent representations, he may upon discovering the fraud rescind the contract; but the great weight of authority holds that if the party defrauded continues to receive benefits under the contract after he had become aware of the fraud, or if he otherwise conducts himself with respect to it as though it were a subsisting and binding engagement, he will be deemed to have affirmed the contract and waived his right to rescind. In other words, the party who has been misled is required, as soon as he learns the truth, and discovers the falsity of the statements on which he relied, with all reasonable diligence to disaffirm the contract and give the other party an opportunity of rescinding it, and of restoring both of them to their original position. The party deceived is not allowed to go on deriving all possible benefit from the transaction, and then claim to be relieved from his own obligations by seeking its rescission."

In *Shappirio* v. *Goldberg,* 192 U. S. 232, 24 S. Ct. 259, 261, 48 L. Ed. 419, the court said:

"It is well settled by repeated decisions of this court that where a party desires to rescind upon the ground of misrepresentation or fraud, he must, upon the discovery of the fraud, announce his purpose and adhere to it. If he continues to treat the property as his own the right of rescission is gone, and the party will be held bound by the contract. * * * In other words, when a party discovers that he has been deceived in a transaction of this character, he may resort to an action at law to recover damages, or he may have the transaction set aside in which he has been wronged by the rescission of the contract. If he choose the latter remedy, he must act promptly, 'announce his purpose and adhere to it,' and not by acts of ownership continue to assert right and title over the property as though it belonged to him. * * * He cannot * * * treat the property as his own and exercise acts of ownership over it which show an election to regard the same as still his, and at the same time preserve his right to recission. In the present case, after discovering that the part of lot 2 had not been conveyed by the deed, Shappirio collected rents for some months upon the property, corresponded with Goldberg as to future terms of rental, declined to reduce the rent, made some repairs upon the property, and performed other acts of ownership. This conduct is wholly inconsistent with an election to undo the transaction and stand upon his right to rescind the contract."

See, also, 2 Pomeroy's Equity Jurisprudence, P. 1863; *Le Vine* v. *Whitehouse,* 37 Utah 260, 109 P. 2, Ann. Cas. 1912C, 407; *Jones Mining Co.* v. *Cardiff Min. & Mill. Co.,* 56 Utah 449, 191 P. 426; *McKellar Real Estate & Investment Co.* v. *Paxton,* 62 Utah 97, 218 P. 128.

The fact that Mr. Moore was notified in March of 1926 by Mr. Duncan, representing the railroad company, that the hotel and some of the other farm buildings were on railroad land is supported by a preponderance of the evidence. Mr. Moore did not contradict or deny the testimony of Mr. Duncan. Moore had testified that he did not know prior to about July of 1928 that the hotel was on railroad ground, although he said the railroad agent at Juab had mentioned the matter of a lease to him some time before that. The time was not fixed nor details of the conversation stated. He also said he had talked with a representative of the railroad

company about a year before his conversation with the Juab station agent. This testimony by Moore is rather corroborative than otherwise of the testimony given by Mr. Duncan. We think there is no question but that, under the evidence, Moore's attention was called to the matter of ownership of the land on which the buildings rested at least as early as March of 1926. In this conversation with Duncan, however, no mention was made of the water. Moore testified he did not learn that the water flowing from the railroad water tank onto the meadow or that which was piped from the water tank to the old hotel building was actually owned by the railroad company until about October of 1930, after this suit was commenced. The claimed misrepresentation with respect to the water is neither specific nor clear. The physical facts were such as should immediately have put a reasonable person on notice that the railroad company was the owner of the water and that any use thereof by others was pursuant to some contract or permissive arrangement with the company. Moore's testimony in this respect is as follows:

"Q. At that time I will ask you if you observed whether there was any water flowing on the land? A. Yes.

"Q. Where was that? What part of the ranch was this that you came through? A. The water was coming right, just above the railroad station, coming through the meadow."

He then testified there were about 400 acres of meadowland and identified the lands on a map, and that about 125 acres of meadow was watered from this particular source; that there was another water source, a spring which he indicated on the map. Then the following questions were asked and answered:

"Q. What I am interested in is getting the source, the ground irrigated by the source of water coming from the station grounds. A. Yes.

"Q. Was that water flowing through on that property when you went over there with Nephi M. Taylor and Mr. Jacobsen? A. Yes.

"Q. Was there a conversation at that time? A. He (Nephi M. Taylor) says: 'We have got plenty of water,' he says 'This, all was watered, well watered.'

"Q. 'Well watered'? A. 'You will have no trouble with water, we own all this water, it is well watered and raises any kind of hay you want to raise.' We rode right through the meadow with the water on it."

Mr. Moore further testified he made no inquiry as to the source of the water which flowed off the station grounds, but that he did not know it came from the railroad tank at that time. He did not say when he first learned that the water did flow from the railroad tank. No one could have been on the place long without becoming aware of the source of the water used in the hotel building, and also that which flowed from the station grounds or to the meadow, and that it came from the railroad tank. The physical facts raise a strong presumption that the water did not come from any first-class water right owned by the Taylors. When in March of 1926 Moore learned that the railroad company owned the land on which the buildings were located, he already knew the water he was using in the hotel building and for irrigation came from the railroad tank. There was then no excuse for further delay in making inquiry to determine by what right, if any, he was and had been using water from the railroad tank for culinary and irrigation purposes. If he had at the time he entered into the contract of purchase been lulled into security by the representation of Nephi M. Taylor respecting ownership of a good water right, surely he was then, in 1926, on notice of facts which he could not further ignore. The physical facts speak louder than any representation which Taylor could have made, that the hotel was on railroad property, and also that the water from the water tank was owned by the railroad company. *Gibson* v. *Jensen*, 48 Utah 244, 158 P. 426. The means of knowledge is equivalent to knowledge. A party who has opportunity of knowing the facts constituting the alleged fraud cannot be inactive and afterwards allege a want of knowledge that

arose by reason of his own laches and negligence.  *Salt Lake City* v. *Salt Lake Inv. Co.*, 43 Utah 181, 134 P. 603.

The respondents by delay waived the right to rescind, and they must be left to their remedy at law for damages.  The judgment and decree of the court is reversed, and the cause remanded to the district court of Juab county for a new trial.  Costs to appellant.

ELIAS HANSEN, C. J., and EPHRAIM HANSON, MOFFAT, and WOLFE, JJ., concur.