## MIGLIACCIO v. CONTINENTAL MINING & MILLING CO.

### No. 4348.

United States Court of Appeals
Tenth Circuit.

April 11, 1952.

Rehearing Denied May 7, 1952.

.Phillips, Chief Judge, dissented.

H. A. Rich, Salt Lake City, Utah (K. K. Steffensen, Salt Lake City, Utah, on the brief), for appellant.

J. Grant Iverson, Salt Lake City, Utah, for appellee.

Before PHILLIPS, Chief Judge, and HUXMAN and MURRAH, Circuit Judges.

MURRAH, Circuit Judge.

This is an appeal from a judgment of the District Court of Utah, rescinding a lease and option agreement for the purchase of mining claims in Emery County, Utah, by the appellee from the appellant, and awarding the appellee compensatory damages. The lease and option agreement was entered into on April 8, 1950, to supersede a sale and mortgage of the same property signed by the parties on January 9, 1950.

The lease and option provided in substance that the appellant would convey all of his right, title and interest in and to Vanadium King Claims 1 to 7, situated in Emery County, Utah, in consideration of the sum of $250,000.00, $5,000.00 of which was to be paid upon delivery of the said lease and option, the remainder to be paid in stipulated installments. The agreement recited that the appellant holds and controls the described mining claims, subject to the paramount title in the United States, and also subject to certain adverse claims and demands of Frank Davis in an action entitled "Migliaccio v. Frank Davis" (referred to in the trial and here as the Davis case); and various other adverse claims or pretended claims of both the plaintiffs,

and certain of the defendants in an action then pending in the District Court of Emery County, entitled "Frank Hanson, Moroni Hunt, Loran Hunt, Elma E. Hunt and John Burton, plaintiffs vs. Jessie Bitterbaum, F. B. Hammond, et al., defendants," (referred to in trial and here as the Hunt case). As a part of the consideration for the lease and option, appellee agreed "to take over, handle, conclude, prosecute and/or defend to final determination all legal matters affecting said mines, mining claims and mining properties, at its own cost and expense" and also to reimburse the appellant for all sums, not to exceed $10,000.-00, to which he might become indebted to Frank Davis on an accounting sought by him in the Davis case, said sums when paid to be credited on the purchase price.

The gist of this suit to cancel the lease and option is that appellant made certain false representations concerning the interest owned and conveyed in the lease agreement, upon which the appellee relied. In particular, it was alleged that the appellant represented to the appellee that he owned the mining claims in question, subject only to the judgment in favor of Frank Davis in the Davis case, and the adverse claims of the plaintiffs and certain defendants in the Hunt case, both of which appellee undertook to prosecute and defend to final determination. It is alleged that on or about February 2, 1950, before the lease and option was consummated, the officers of appellee were informed that counsel for the appellant's predecessors in title had, on May 5, 1942, in an action pending in the District Court of Emery County, Utah, "C. A. Gibbons et al. vs. J. B. Davis et al." (referred to in the trial and here as the Gibbons case), entered into a stipulation, under the terms of which the appellant's predecessors in title, Davis et al., had agreed to accept an undivided 5 per cent interest in and to the claims in question in compromise of the litigation between the parties in that case over the title to the claims; that when asked about this stipulation, appellant falsely represented to the appellee's officers that he knew of his own knowledge that the plaintiffs in the Gibbons action had abandoned the mining claims,

and the suit was therefore without foundation; that in any event, the stipulation on behalf of his predecessors in interest by their attorney of record was entered into without authority. It is said that relying upon this representation, they entered into the lease and option agreement to learn soon thereafter that a judgment had been entered in the Gibbons case upon the stipulation, under the terms of which the appellant could have only 5 per cent interest in the claims covered by the lease. A recitation of the history of the litigation is essential to a proper consideration of the question involved.

Prior to 1940, a group referred to throughout the trial as the Gibbons-Bitterbaum Group, located twenty-eight mining claims in Emery County, Utah. In January, 1941, John B. Davis and others located seven mining claims, known as the Vanadium King Claims 1 to 7. These claims overlapped some of the Gibbons-Bitterbaum Claims, and after the filing of the Vanadium King Claims, the Gibbons-Bitterbaum Group instituted a quiet title action against John B. Davis and his associates. On May 15, 1942, Therald Jensen and Duane Frandsen, representing the Gibbons-Bitterbaum Group, and F. B. Hammond, representing Davis et al., entered into a stipulation, under the terms of which the Gibbons-Bitterbaum Group agreed to accept an undivided 85 per cent interest in the 28 mining claims, and Davis and his associates agreed to accept 7½ per cent. The other 7½ per cent was set over and given to A. L. Tomlinson. This stipulation covered all of the Gibbons-Bitterbaum Claims, including the 7 Vanadium King Claims. Hammond received 2½ per cent interest in Davis' 7½ per cent and 2½ per cent of Tomlinson's interest. A journal entry of a judgment upon this stipulation was signed on the same day, May 15, 1942, but it was not filed of record and apparently no formal judgment was entered at that time. The date of the journal entry was later changed to August 11, 1948, and finally filed of record on April 18, 1950. Meanwhile, on May 27, 1942, Davis having acquired the interest of his associates by quitclaim, quitclaimed all of his interest to the appellant. There was testimony to the

effect that after acquiring Davis' interest in the property, appellant collaborated with attorneys Jensen and Hammond in an effort to sell the mining claims, and that from the execution of the stipulation until 1948, all notices of intention to hold the mining claims covered by the stipulation were filed by attorney Jensen for the purpose of protecting the interest of all the parties, including the appellant as successor in interest to John B. Davis; that the appellant otherwise recognized and ratified the stipulation and the interests provided therein by agreeing to a lease of the property to other parties who operated it in 1948; and that he took a sublease from these lessees on certain of the claims and operated the properties thereunder during the year 1948. In 1948, the Hansen-Hunt Group filed claims over the claims in question, and then instituted an action to quiet title against all of the parties to the Gibbons suit, and in addition, made the appellant a party defendant. The latter case is referred to as the Hunt case in the lease and option agreement, and one which appellee undertook to defend.

A third suit was instituted by appellant against Frank Davis, who claimed some interest in the property through his brother, John B. Davis, from whom appellant also derives his title. This suit resulted in a judgment decreeing Frank Davis to be the owner of 37½ per cent interest in the Vanadium King Claims, and the appellant 62½ per cent interest. This case is referred to as the Davis case, and one which the appellee specifically undertook to prosecute in the Supreme Court of Utah.

The lease and option agreement did not mention the Gibbons suit, which resulted in the stipulation, and the gist of the claimed fraud revolves around the representations made by the appellant respecting the force and effect of this particular stipulation, under which appellant, as successor to John B. Davis, ultimately received an undivided 5 per cent interest in the claims in question.

As to this matter, the trial court found that when confronted with the stipulation on February 2, 1950, appellant falsely represented to the appellee that it was entered into by counsel of record without authority;

that the Gibbons-Bitterbaum Group had abandoned the claims; and that he further falsely represented that he had been in continuous possession of the claims since 1942, had performed exploration work thereon, and had resumed possession of the claims and actively developed them since 1948. The court further found in effect that from the appellee's examination of data available to it, it had a right to rely upon such representations, and did so; that instead of getting a lease on claims subject only to the Davis and Hunt litigation, it got a lease on only 5 per cent of such claims in accordance with the stipulation, to which the appellant was in privy, and which he had recognized and ratified. After rescinding the lease, the court awarded appellee damages for the $5,000.00 paid under the terms of the lease agreement, and $3,263.54 expended by appellee in connection with defense of the lawsuits mentioned in the lease option agreement. Thereafter appellee filed a partial satisfaction of judgment for $1,013.54, as not being supported by the evidence.

On appeal, appellant concedes that no reference was made in the option agreement to the Gibbons litigation, or to the stipulation therein. He does earnestly suggest, however, that the appellee, through its president, secretary-treasurer and legal counsel, had actual and constructive knowledge of the stipulation, and was therefore chargeable with all of the facts bearing upon it and its legal consequences as well. He does not deny discussing the stipulation with appellee's officers before entering into the option agreement. He does strenuously deny that they relied upon any representations he made concerning it, and says that having knowledge of the stipulation, they made an independent investigation concerning it and entered into the agreement after satisfying themselves that it was of no legal efficacy. Finally it is said that any representations made by him to the corporate officers were merely expressions of opinion concerning the legal force and effect of the stipulation, as to which he is not chargeable in fraud.

The evidence shows without much dispute that both Frawley and Elggren, Presi-

dent and Secretary-treasurer, respectively, of appellee corporation, were lawyers, and that Migliaccio was a pick-and-shovel miner. Frawley and Elggren knew when they commenced negotiations with Migliaccio that his title to the mining claims was involved in a morass of litigation. Before any agreement was reached in writing, they were furnished an abstract of title bearing the certificate of an Emery County abstract company dated August 15, 1949, containing, among other entries, the stipulation dated May 15, 1942, in the Gibbons suit. President Frawley testified that when on February 2, 1950, he and Elggren discussed the stipulation with Migliaccio, he told them that the stipulation was "immaterial" because the Gibbons Group had abandoned their claims and he had evidence to prove it; that he was in possession of the claims and was working them at the time. Frawley further testified that Elggren examined the file in the Gibbons case and found only the stipulation and a demurrer; that upon further investigation, he found that Migliaccio was in possession of the claims, was working them, and receiving payments from the Atomic Energy Commission for the shipments of ore. He concluded that since there was nothing to show that the issues had been joined in the Gibbons suit and no judgment entered, Migliaccio's statement that the Gibbons Group had abandoned their claim was correct.

After the execution of the sale and mortgage agreement on January 9, 1950, and before the execution of the option agreement, the transcript of the record on appeal in the Davis litigation had been delivered to Frawley and Elggren, and by them delivered to attorneys whom they had hired to represent Migliaccio on appeal to the Supreme Court of Utah. This record contained the testimony of lawyer Hammond who had executed the stipulation on behalf of Davis, and who testified in the Davis litigation concerning the details under which it was executed. Significantly, Hammond testified to having held Davis' quitclaim deed to Migliaccio in his files, and refusing to deliver it to him until he recorded a subsequent deed from Davis, which had the effect of recognizing Hammond's

interest in the property under the stipulation. Frawley admitted having possession of the record and delivering it to his attorneys. He did not read the transcript in detail, but relied upon Migliaccio's statements to the effect that he owned 100 per cent of the claims, subject to the litigation referred to in the agreement.

Elggren, Secretary-treasurer of the Company, testified that before the execution of the note and mortgage in January, Migliaccio represented that he was the 100 per cent owner of the claims, subject only to the Hunt and Davis lawsuits. He said that he first learned of the stipulation through a Mr. Tomlinson, now deceased; that Migliaccio told them that he knew nothing about the stipulation and that it had no effect on his claims; that he personally went to the county seat of Emery County and examined all records in the three cases, that is, the Gibbons, Hunt and Davis cases; that the only instruments in the files of the Gibbons case was the stipulation and a demurrer. He testified that an investigation "led us again to believe what Mr. Migliaccio had told us, that they [Gibbons Group] had abandoned their claims." Soon after the judgment was finally entered on the stipulation on April 18, 1950, Elggren wrote Migliaccio in behalf of the Company, rescinding the agreement, stating, among other things, that "before the original lease and option was executed, we had detailed discussions and made a searching examination of all the facts concerning your title to the Vanadium King Claims and the litigation related thereto as presented to us by you. * * *"

In a prospectus prepared for the federal and state Security Commissions by Frawley and Elggren, the history of the Davis litigation was reviewed in detail. It was therein stated that Migliaccio's title to his interest in the claims was based upon the deed from John B. Davis in 1942; that his deed was delivered to Migliaccio in Hammond's office, Price, Utah, and by him delivered to Hammond for temporary safe-keeping; that the attorney subsequently not only failed to record the instrument, but refused to deliver the same to Migliaccio; and that at the trial of the Davis case, Hammond

had testified in effect that he had held the deed for reasons which had no material relevancy to any of Migliaccio's matters. The prospectus went on to recite how Frank Davis had acquired an interest from his brother, and how Frank Davis and Magliaccio had agreed to work the mining claims together; that a dispute followed in which Frank Davis claimed an undivided ⅜ths interest, based upon a deed from his brother, John B. Davis. This, said the prospectus, was the basis of the Davis litigation which resulted in a district court judgment decreeing Davis to be the owner of ⅜ths or 37½ per cent interest in the mining claims, and this was the litigation the appellee undertook to prosecute in the Supreme Court with a "good opportunity to obtain a reversal."

■ It is a well recognized rule that "one has a right to rely on statements of material facts or on positive statements, essentially connected with the substance of the transaction, where they are not mere general commendations or expressions of opinion, and are as to matters within the knowledge of the person making them, as to matters which he assumes to assert as of his knowledge, or as to matters which from their nature or situation are peculiarly within his knowledge." 23 Am.Jur., Fraud and Deceit, Sec. 146, p. 949, and cases cited. But, "before any one can have relief from a claimed fraud he must show not only that he relied on the misrepresentation but also that he had the right to rely on it." Johnson v. Allen, 108 Utah 148, 158 P. 2d 134, 137, 159 A.L.R. 256.

■ It is settled law in Utah, as elsewhere, that whenever a grantor or vendor admits that his title is defective or encumbered, or that there is some outstanding claim or equity in the property, or makes any other communication which, unexplained would constitute an actual notice, or makes any other explanation which brings notice of such encumbrance to the grantee, the purchaser is not warranted in accepting his declaration to the effect that the defect or encumbrance has been removed or is ineffectual. The information thus received puts him upon inquiry and he is chargeable with the exercise of his own judgment concerning the validity of the title. O'Reilly v. McLean, 84 Utah 551, 37 P.2d 770. Knowledge which is sufficient to lead a prudent person to inquire about the matter when it could have been ascertained conveniently, constitutes notice of whatever the inquiry would have disclosed, and will be regarded as knowledge of the facts. Columbian Nat'l Life Ins. Co. v. Rodgers, 116 F.2d 705. And, Utah courts have said that "A party who has opportunity of knowing the facts constituting the alleged fraud cannot be inactive and afterwards allege a want of knowledge that arose by reason of his own laches and negligence." Taylor v. Moore, 87 Utah 493, 51 P.2d 222, 229. A mere expression of an opinion by one dealing with real estate as to the title he purports to convey, truthfully stated or equally within the knowledge of both parties, does not constitute fraud even though the opinion is not well founded. For the plainest of reasons, an expression of an opinion as to one's title cannot be made the basis of a charge of fraud. See 23 Am.Jur., Fraud and Deceit, Sec. 50, p. 817.

■ From the evidence, it is manifest that the appellant did not deliberately conceal any facts from appellee. He was not a party to the stipulation, but he was bound thereby. It was entered into in 1942, but the judgment thereon was not entered until 1950. Skidmore and Howard had performed some operations under a lease from Jensen, but the appellant had also been working the claims under an oral agreement between the parties, and had litigated his title thereto against Frank Davis, who claimed under his brother. Appellant was admittedly in possession of the claims and was receiving payment from the Atomic Energy Commission for the ore produced therefrom. These facts were ascertained and in possession of the appellee when they began negotiations. A district court had decreed Migliaccio to be the owner of 62½ per cent of the claims and he was appealing from that judgment, claiming full ownership. Appellee had sufficient faith in his cause to undertake the prosecution of the appeal to the Supreme Court. These facts are consistent with his contentions and representations that he owned the mining

claims subject to pending litigation. They are indeed wholly inconsistent with bad faith or an intention to deceive. The Davis litigation tells the whole story of the stipulation about which appellee claims to have been deceived by the misrepresentations of Migliaccio, and this story in all of its details was either known to the appellee or certainly readily accessible to it.

To us, it is clear that when the parties came to execute the option agreement, both had equal access to the same facts. Neither had peculiar knowledge, and the lawyer-officers of the appellee were doubtless in a better position to appraise the legal consequences of those facts. Before the agreement was consummated, the parties, with equal knowledge of the facts, came to the same conclusion concerning the legal effect of the stipulation on Migliaccio's title, and the appellee cannot now complain of fraud if they both guessed wrong.

We conclude that the judgment of the court is clearly erroneous and it is reversed.

PHILLIPS, Chief Judge (dissenting).

Continental Mining and Milling Company,[1] a corporation, brought this action against Migliaccio to rescind a written agreement under which certain mining claims in Emery County, Utah, were leased to Continental with an option to purchase, and to recover damages on the ground of fraud. Migliaccio has appealed from a judgment in favor of Continental.

The following facts were established by substantial evidence:

The mineral claims involved in the controversy, known as the Vanadium King Claims Nos. 1 to 7, were located over other claims which had been filed upon theretofore by a group known as the Gibbons-Bitterbaum Group. Migliaccio's predecessors, known as the Davis Group, filed the Vanadium King claims after the Gibbons-Bitterbaum Group failed to file a proof of labor for the year 1940, alleging that fact as evidence of abandonment of the claims by the Gibbons-Bitterbaum Group.

After the filing of the Vanadium King claims, the Gibbons-Bitterbaum Group brought a quiet title action against the Davis Group. To compromise such action, the parties signed a stipulation wherein they agreed that Davis was entitled to a 7½ per cent interest, Tomlinson, another member of the Davis Group, 7½ per cent interest, and the Gibbons-Bitterbaum Group the remaining interest in the claims. The attorney for Davis was to receive a 2½ per cent interest, leaving Davis with a 5 per cent interest. The stipulation was signed and filed May 15, 1942, but judgment was not entered thereon until April 18, 1950.

On May 27, 1942, Davis and his wife executed a deed conveying all their interest in the claims, which amounted to 5 per cent of the total, to Migliaccio. The deed did not recite the interest owned by Davis. It was left with Hammond, to be given to Migliaccio if an effort of the Gibbons-Bitterbaum Group to sell all of the interests in the claims failed. While the negotiations for this sale were being conducted, Migliaccio had several discussions with Hammond, attorney for Davis, and Therald Jensen, attorney for the Gibbons-Bitterbaum Group, during which the fact that Davis had a 5 per cent interest was discussed many times.

The negotiations for the sale by the Gibbons-Bitterbaum Group did not materialize. But, in 1943, interest in the claims was renewed and Migliaccio requested Hammond to prepare a deed conveying to Migliaccio the interest Davis was to receive under the stipulation. On July 9, 1943, Hammond drew a second quitclaim deed from Davis and wife conveying all their right, title, and interest in the claims to Migliaccio. It recited the fact that Davis had a 5 per cent interest in the claims. It was never recorded, but it was delivered to Migliaccio on the day it was executed and remained in his possession thereafter.

About June 27, 1948, Jensen, acting as attorney for the parties to the action, leased a portion of the claims to Skidmore and Howard. Later, after a discussion with Jensen with respect to such lease, Migliaccio was able to obtain a sublease of several of the claims and entered into possession of them. When Hammond received the

1. Hereinafter called Continental.

money from the Skidmore lease, which represented 5 per cent of the total, he advised Migliaccio that he had $50 for him. Thereafter, Hammond agreed with Migliaccio to pay him the $50 and deliver to him the first quitclaim deed, which did not express the respective interests of the parties, if Migliaccio would also record the second quitclaim deed from Davis, which did express the interests of the parties in the claims. Migliaccio agreed to this and Hammond typed a letter to the clerk and recorder of Emery County, had Migliaccio sign the letter, and enclosed the letter and the two deeds in an envelope addressed to the clerk and recorder. He also gave Migliaccio his check for $50. Migliaccio then went to the clerk and recorder's office and withdrew the second quitclaim deed, which recited the amount of the interest owned by Davis, but left for recording the first quitclaim deed, which did not recite the interest of Davis. He did not cash the $50 check.

In 1948, the Atomic Energy Commission began purchasing ore from the Vanadium King claims, which created renewed interest in those claims. A group of men known as the Hunt Group filed claims over the Vanadium King claims and then filed a quiet title action against the original parties to the suit brought by the Gibbons-Bitterbaum Group, and named Migliaccio also as a party defendant. This case is referred to in the record as the Hunt case.

In the meantime, a dispute arose between Migliaccio and Davis, which resulted in Migliaccio filing a quiet title action against Davis. In 1949, a judgment was entered in that action, which decreed that Davis was the owner of an undivided ⅜ interest and Migliaccio the owner of an undivided ⅝ interest. Migliaccio appealed from that judgment to the Utah Supreme Court and his appeal was still pending at the time the instant action was instituted.

Sometime in November or December, 1949, E. G. Frawley, President of Continental, began negotiations with Migliaccio to acquire the Vanadium King claims. At that time, Migliaccio represented to Frawley that he owned a 100 per cent interest in such claims, subject only to the result of the final judgments in the Davis and Hunt cases. Frawley testified as follows:

"He [Migliaccio] said he owned all of the Vanadium King claims, except such as might be subject to the Davis case and Hunt case."

Elggren, Secretary-Treasurer of Continental, testified as follows:

"He [Migliaccio] said he owned the claims completely. That is, they were claims under the laws of the United States, and subject to only these two lawsuits. He owned 100%."

On January 9, 1950, Migliaccio and his wife executed a deed to the mining claims to Continental. In consideration for the deed, Continental on the same day issued to Migliaccio 100,000 shares of Continental common stock and executed a note for the principal sum of $250,000, and a mortgage of the mining claims to Migliaccio to secure the note. The deed was placed in escrow and was to be delivered when certain stipulated payments had been paid on the note. Continental, as further consideration, agreed to carry on all the litigation pending that might affect the title of the claims, having particular reference to the Davis and Hunt cases. To effectuate the agreement to defend the lawsuits, Continental employed McBroom and Van Dam to represent Migliaccio and turned over to them the files in the Hunt and Davis cases.

Thereafter, and in the early part of February, 1950, Continental learned for the first time, through Tomilson, of the existence of the stipulation filed in the Gibbons-Bitterbaum case. Continental then made inquiry of Migliaccio with respect to the stipulation. Migliaccio at first denied any knowledge of the stipulation. Elggren went to the office of the clerk of the court for the purpose of examining the files in the Gibbons-Bitterbaum case. He found only the stipulation in the files. He asked the clerk for the other papers. The clerk searched the records, but could not find the files and could not find evidence of anybody having taken them out. Continental again made inquiry of Migliaccio with respect to the stipulation. Migliaccio then stated that Davis' attorney had acted without authority in executing the stipulation, and further, that the Gibbons-Bitterbaum Group had abandoned all their rights in the claims. Such representation as to abandonment was

not true. Migliaccio had actual knowledge that these representations were not true, in that he knew Jensen, attorney for the Gibbons-Bitterbaum Group, had annually filed notices of intention to hold the claims for all parties affected by the stipulation from 1942 to 1948, inclusive, and further, that Jensen had told Migliaccio that the Gibbons-Bitterbaum Group had no intention of repudiating the stipulation. Moreover, in accepting the deeds, Migliaccio had ratified the stipulation, as had Davis in executing the deeds, and particularly the deed which recited that Davis' interest was 5 per cent.

On January 27, 1950, a prospectus was issued by Continental which discussed the litigation then pending against the Vanadium King claims. The officers of Continental testified that the information set forth in the prospectus was obtained from Migliaccio himself and not from the records in the possession of their attorneys, McBroom and Van Dam, and that they had not examined such records before they wrote the prospectus.

When this prospectus was filed with the Securities Commission of Utah, it refused to allow the stock to be sold because, in its opinion, the debt was too large in view of the doubtful outcome of the pending litigation. To obviate this difficulty, Continental and Migliaccio entered into the lease and option.

Shortly after the lease and option agreement was entered into, Continental learned that a judgment had been entered on the stipulation. When it confronted Migliaccio with this, he denied that the stipulation affected his rights in any manner. Continental then sent him a letter dated June 1, 1950, giving notice of its election to rescind the lease and option agreement.

At the time of the contracts between Continental and Migliaccio, Migliaccio was in possession of the claims, working them, and was receiving payments from the Atomic Energy Commission. In the negotiations between the parties, Migliaccio stated that he was in possession of the claims and Continental ascertained that he was receiving payments from the Atomic Energy Commission for ore shipped.

Shortly after the first contract was entered into, and before the lease and option was entered into, Migliaccio became a stockholder in Continental and a member of its board of directors, and thereafter and at the time the lease and option agreement was entered into, Migliaccio occupied a fiduciary relationship to Continental. That relationship also existed when Continental discovered the existence of the stipulation and at the time of Migliaccio's representations with respect thereto and the abandonment of the claims by the Gibbons-Bitterbaum Group.

Continental, believing the representations of Migliaccio as to his ownership of the mining claims, and relying thereon, agreed to purchase such claims from Migliaccio, issued the Continental stock to Migliaccio and executed and delivered the note and mortgage to Migliaccio. Thereafter, believing Migliaccio's representations with respect to the stipulation and the abandonment of the claims by the Gibbons-Bitterbaum Group, and relying thereon, Continental entered into the lease and option agreement.

The trial court found the facts substantially as hereinbefore stated.

It is my opinion that this court cannot, on a consideration of the entire evidence, reach a definite and firm conviction that the findings of the trial court were clearly erroneous.[2]

Under the great weight of authority, false and positive statements as to title constitute actionable misrepresentation of fact[3] which

2. See H. F. Wilcox Oil & Gas Co. v. Diffie, 10 Cir., 186 F.2d 683, 696; United States v. U. S. Gypsum Co., 333 U.S. 364, 365, 68 S.Ct. 525, 92 L.Ed. 746.

3. Burns v. Dockray, 156 Mass. 135, 30 N. E. 551, 552; Westerman v. Corder, 86 Kan. 239, 119 P. 868, 870, 39 L.R.A., N.S., 500; Martin v. Hughes, 156 Kan. 175, 131 P.2d 682, 684; Loverin v. Kuhne, 94 Conn. 219, 108 A. 554, 555, 33 A.L.R. 848; Stoltzfus v. Howey, Mo. App., 54 S.W.2d 501, 505; White v. Reitz, 129 Mo.App. 307, 108 S.W. 601, 602, 603; Reynolds v. Franklin, 39 Minn. 24, 38 N.W. 636; Patzman v. Howey, 340 Mo. 11, 100 S.W.2d 851, 856; Bu-

may be relied upon without investigation where there exists a relation of confidence or inequality of knowledge.[4]

In Steele v. Banninga, 225 Mich. 547, 196 N.W. 404, 407, the court said:

"The dividing line between a false representation and a mere opinion is not well marked, and cannot be marked in the abstract, as it must necessarily depend upon the facts in a case. If defendant, for the purpose of deceiving the plaintiffs as to the title, gave them an opinion he knew to be untrue, and they relied thereon, then he cannot escape liability, for, in such event, it was not an opinion distinguishable from a false representation. The fact that plaintiffs had some information and sought more from sources other than defendant would not release defendant from false and fraudulent misrepresentations if plaintiffs relied thereon, in whole or in part, in making the purchase. It was not necessary for the jury to find that plaintiffs relied solely upon the representations of title made to them by defendant. If the representations made by defendant were the moving and procuring reason for plaintiffs' purchase, defendant cannot be heard to say that, if they had not believed him but had used diligence to verify what he had said, they would have discovered reasons for not purchasing. If plaintiffs knew Stamp was in possession, claiming ownership, and failed to find out from Stamp the nature and extent of his claim, but instead went to defendant and relied upon what he said, and defendant was dishonest and intentionally deceived them, then defendant is liable, even if the truth lay elsewhere and plaintiffs might have found it out had they looked beyond defendant in their search for it."

At the time the deed, note, and mortgage were executed and the stock issued, Continental was not informed of any facts casting doubt upon the truth of Migliaccio's representations and it had a right to rely on such representations.

At the time the existence of the stipulation was discovered by Continental, the relation of the parties had changed. Migliaccio had become a director of Continental and occupied a fiduciary relationship to Continental. That relationship existed also at the times of Migliaccio's representations with respect to the stipulation and the abandonment of the claims by the Gibbons-Bitterbaum Group.

Where a confidential relationship exists between a seller and a purchaser, no duty develops upon the purchaser to make an independent investigation and he has a right to rely upon the truth of disclosures made by the seller and it is the duty of the latter to make full and truthful disclosures of all the material facts. Where such a relationship exists, nothing short of actual knowledge will preclude recovery for a misrepresentation of a material fact.[5]

Because of such confidential relationship, a duty devolved upon Migliaccio to make full and truthful disclosure to Continental with respect to the stipulation and the claims of the Gibbons-Bitterbaum Group.

The confidential relationship between Migliaccio and Continental clearly distin-

chanan v. Burnett, 102 Tex. 492, 119 S. W. 1141; 37 C.J.S., Fraud, § 56, pp. 330, 331; 23 Am.Jur., Fraud and Deceit, § 146, p. 949.

4. Steele v. Banninga, 225 Mich. 547, 196 N.W. 404, 407; Old National Life Ins. Co. v. Bibbs, Tex.Civ.App., 184 S.W.2d 313, 316; Curtley v. Security Savings Society, 46 Wash. 50, 89 P. 180, 181, 182; Riley v. Bell, 120 Iowa 618, 95 N.W. 170, 172; Loverin v. Kuhne, 94 Conn. 219, 108 A. 554, 555; Seeger v. Odell, 18 Cal. 2d 409, 115 P.2d 977, 980, 981, 136 A.L. R. 1291; 37 C.J.S., Fraud, § 56, pp. 330, 331; 23 Am.Jur., Fraud and Deceit, § 146, p. 949.

5. Butcher v. Newburger, 318 Pa. 547, 179 A. 240, 241; McDonough v. Williams, 86 Ark. 600, 112 S.W. 164, 167; Hicks v. Wallace, 190 Ky. 287, 227 S.W. 293, 296; Hulett v. Kennedy, 4 Ind.App. 33, 30 N.E. 310, 312; Davenport v. Buchanan, 6 S.D. 376, 61 N.W. 47, 49; Hawk v. Brownell, 120 Ill. 161, 11 N.E. 416; Edward Barron Estate Co. v. Woodruff Co., 163 Cal. 561, 126 P. 351, 357, 42 L.R.A.,N.S., 125; Johnson v. Savage, 50 Or. 294, 91 P. 1082, 1083; Burgess v. Charles A. Wing Agency, 139 Or. 614, 11 P.2d 811, 813, 814; 37 C.J.S., Fraud, § 27b, p. 269, § 35, p. 282; 26 C.J., Fraud, § 56, p. 1137, § 72, p. 1158.

guishes the instant case from O'Reilly v. McLean, 84 Utah 551, 37 P.2d 770.

The negotiations between the parties finally culminated in the lease and option to purchase agreement. It was not until the fiduciary relationship came into existence that Continental was advised of any facts casting doubt as to the truth of the representations which had been made by Migliaccio. At the time the representations were made by Migliaccio with respect to the stipulation and the abandonment of the claims by the Gibbons-Bitterbaum Group, Continental, because of the existing confidential relationship, had the right to rely upon such representations without further inquiry.[6] Such misrepresentations are sufficient, standing alone, to support the conclusions of law made by the trial court and the judgment rendered against Migliaccio.

It is my conclusion that the representations made by Migliaccio were positive statements with respect to his ownership of the claims and did not fall within the category of opinion; that Migliaccio had full knowledge with respect to his title and that there was an inequality of knowledge as between him and Continental; and that because of the confidential relationship existing between Migliaccio and Continental, the latter had the right to rely on Migliaccio's representations with respect to the stipulation and the abandonment of the claims by the Gibbons-Bitterbaum Group, and that there was no duty upon the part of Continental to make a full investigation with respect thereto.

For the reasons indicated, I respectfully dissent.

6. See cases cited in Note 5.